48 A.3d 1130

F.H.U., PLAINTIFF–RESPONDENT/CROSS–APPELLANT,[1]
v. A.C.U., DEFENDANT–APPELLANT/CROSS–
RESPONDENT.

Superior Court of New Jersey
Appellate Division

Argued April 16, 2012—Decided August 7, 2012.

---

[1] In the trial court order, the parties were designated as petitioner and respondent.

360

Before Judges A.A. RODRÍGUEZ, SABATINO and FASCIALE.

*Shabbir Q. Shehabuddin* argued the cause for appellant/cross-respondent (*The Law Offices of Abdelhadi & Associates, L.L.C.*, attorneys; *Mr. Shehabuddin,* on the brief).

*Amy Sara Cores* argued the cause for respondent/cross-appellant (*The Law Offices of Amy Sara Cores, L.L.C.*, attorneys; *Ms. Cores,* on the brief).

The opinion of the court was delivered by

A.A. RODRÍGUEZ, P.J.A.D.

We affirm the April 29, 2011 Family Part order directing A.C.U. (Father), to turn over his nine-year-old daughter, M.U., to her mother, F.H.U. (Mother). This will allow the return of M.U. to her former home in Turkey. We hold that when petitioning for the return of a child under the Hague Convention on the Civil Aspects of International Child Abduction [2] (Hague Convention or Convention), although the Convention requires an analysis of a wrongfully removed child's "well-settled" status in his or her new country when the petition is filed more than one year after the removal, this required analysis is not a jurisdictional limitation. Therefore, based on the merits and other criteria set by the Hague Convention, a court may order the return of such child to the home country despite a finding that he or she is well-settled here.

It is undisputed that in June 2008, Father took his then-five-year-old daughter, who was born in the United States,[3] from their home in Turkey for a trip here. He contends this was done with the permission of his wife, who is the child's mother. Mother argues that she only consented to a family trip to Italy, and that under the guise of acquiring documents to that end, Father

---

[2] Oct. 25, 1980, T.I.A.S. No. 11670, 1343 U.N.T.S. 49.

[3] The daughter was born in Wayne, New Jersey, while her parents were vacationing. Both parties agree that the timing of the vacation was arranged so that the child would be born in this country.

spirited M.U. to the United States. Fearing she would never see her daughter again, Mother obtained a temporary decree of custody from a Turkish court. She then filed a petition seeking the return of her child from the United States to Turkey, pursuant to Article 12 of the Hague Convention, and the International Child Abduction Remedies Act (ICARA), 42 *U.S.C.A.* § 11601 to –11. Article 12 of this treaty requires the return of a child found to be wrongfully removed from his or her habitual residence unless the petitioned-for action is commenced in the reviewing country more than one year from the date of wrongful removal. After that point, prior to ordering a return, the court or reviewing authority must consider whether the child is well-settled in the new country.

Mother obtained a temporary custody order in Turkey on October 24, 2008. After the Hague Convention petition was transmitted from Turkey to the United States, bureaucratic delays [4]—including finding pro bono counsel—and travel costs impeded commencement of an action in New Jersey until December 2010. After a testimonial hearing, the trial court issued a decision finding that Father wrongfully removed the child and that none of the defenses available to Father pursuant to the Convention applied. The trial court ordered the child returned to Turkey. Although the action was commenced in New Jersey more than one year after the wrongful removal, the trial court held the provision of the Convention looking at whether the child is well-settled in the new country after one year was subject to equitable tolling due to delays in handling the petition. On temporary remand from this court, the trial court issued a supplemental ruling finding M.U. to be well-settled, but reiterated its prior return order.

Father now appeals the trial court's tolling of the Convention's one-year filing term and its findings that none of its available defenses apply. For the reasons that follow, we affirm the order

---

[4] At the time the petition was transmitted, the United States Central Authority was the National Center for Missing and Exploited Children. During the action's pendency, that responsibility was moved to the United States State Department, Office of Children's Issues.

returning M.U. to Turkey, but hold that the trial court erred in part of its analysis by equitably tolling Article 12 under these facts.

## LITIGATION IN THE UNITED STATES

At a hearing commencing on February 3, 2011, the trial court heard testimony on the issues of jurisdiction and the circumstances of M.U.'s removal from Turkey that had occurred over two-and-one-half-years earlier. Mother testified that she resides in Istanbul, Turkey, with her parents. She remains married to Father. They were married on December 6, 1997, and lived together until June 20, 2008, when he left Turkey with M.U.

The couple met in March of 1996, after Father had returned from completing his Master's degree from the University of Miami. She had not been to the United States before 2002, when she came to New Jersey for M.U.'s birth, with a tourist visa. She arrived six-months pregnant, and left three weeks after M.U.'s birth. They traveled here in 2002 because Father wanted M.U. to have United States citizenship.

Weeks after M.U.'s birth, the family returned to Turkey and lived there until June 2008. M.U. speaks Turkish. She had a relationship with family and friends, and was enrolled in preschool. However, Father would not let Mother take M.U. to visit her family except for holidays.

According to Mother, their families were a significant source of conflict in their marriage. Mother once left the marital home with M.U. and stayed with her parents for a week. She informed Father where she was, and soon returned so M.U. could be with her Father.

In December 2007, Mother again left the home, but did not take M.U. with her. She left because Father continuously told her to leave, and his mother moved into the marital home. During this time, Mother saw M.U. every few days at a neighbor's house, but was prohibited by Father from reentering the marital home for a

month. In February 2008, Father's mother refused to allow Mother into the marital home after M.U. had opened the door for her. Subsequently, Mother went to court to gain access to M.U. on weekends.

The Turkish court issued an interim decision granting Mother weekend custody until the formal custody case began. That Thursday, Mother informed Father of the interim decision. Father left the next day with M.U. and three suitcases. When Mother went on Saturday to pick up M.U., her mother-in-law laughed and informed Mother that Father and M.U. were on a vacation in Turkey. Father never called to inform Mother where they were, and Mother filed a police report. A month later, Mother attended the custody hearing, and discovered that although Father was not present, he had filed for divorce. The trial court told Father's attorney that Father had ten days to appear in court or he would award custody to Mother. Father appeared three days later and told Mother he wanted to reconcile. The presence of an elderly member of Father's family persuaded Mother to dismiss the custody case if Father dismissed the divorce case. Mother also consented to removal of court-ordered travel restrictions preventing Father from taking M.U. to the United States without Mother's permission. Mother returned to the marital home and the parties had a reportedly pleasant two months together.

After the custody/divorce actions in Turkey were withdrawn, Father told Mother he was going to take her and M.U. to Milan, Italy, to visit mutual friends. On the morning of June 20, 2008, Father told Mother that the Italian Embassy needed work documents from him to get a travel visa. He invited M.U., then five years old, to come with him to the Embassy. M.U. accepted. Father told Mother that they would be back in a few hours. There were no packed suitcases, although Father took his laptop with him. Father and child left the house.

Around 3:00 p.m., Mother began calling Father's cell phone. It was turned off. She tried again each hour, and began to suspect

that Father had abducted M.U. At 2:00 a.m., she called her brother. He called Father's father, who laughed and said that Father and M.U. had flown to Vienna for a soccer game. In the morning Mother contacted police. Three days later, Father called Mother and told her he was in the United States with M.U. and intended to bring Mother here so she could care for M.U.

Within a month, Mother simultaneously began the petition process pursuant to the Hague Convention and began a custody case in Turkish court. On October 24, 2008, Mother received an interim order from the Fourth Family Court in Kadikoy, granting her custody of M.U.

During the two-and-a-half-years that M.U. was in the United States prior to the hearing, Mother was in contact with M.U. via telephone and internet. From June 2008 to February 2009, they would call Mother. Later, Mother would call every week or few days. Mother feared that M.U. was being "poisoned against" her by the paternal grandmother. M.U. never spoke with Mother's parents or family by phone or through internet chat, "[b]ecause my family was introduced to her [as] disgusting and dirty," though Mother acknowledged that M.U. did not want to talk to them. Mother could not come to the United States before the hearing because she could not get a visa as she was married and Father was a resident alien.

Mother recalled Father traveling to the United States several times between 2005 and 2008 for what he told her was company business. She now believed that the frequent visits were to maintain his "green card," which signifies permanent resident status, for six-month periods.

C.B., Mother's brother, testified that he received a June 20, 2008 telephone call from a shocked Mother reporting that Father had not returned with M.U. He called Father's father and informed him of the circumstances. After looking into the matter, he discovered that Father and M.U. had flown to the United States.

Father testified that he holds Turkish and Cypriot citizenship and is currently a legal permanent resident of the United States. He had not yet applied for United States citizenship, but intended to do so soon. M.U. holds United States, Turkish, and Cypriot citizenship. At the time M.U. was born, Father and Mother were looking for job opportunities and to settle here. He looked for a job with a company that could sponsor him for an H–1 visa, but was unsuccessful. They returned to Turkey three weeks after M.U.'s birth.

Father testified that he and Mother had met when they were younger, as their families were close. He had come to the United States after graduating as valedictorian from the Middle East Technical University and receiving a scholarship to study at the University of Miami. In March 1995, while Father was still at Miami, the couple's courtship began through pre-engagement telephone conversations. Therein, the couple routinely discussed his desire to settle in the United States with her once they were married. She did not object at that time to moving here. These conversations continued through August 1996, when Father returned to Turkey "to make the engagement."

Father had a tourist visa for ten years before getting a green card in 2005. According to Father, his wife knew of the plan to first take M.U. to the United States and then bring Mother over. He further testified that Mother did not object, but believed her family did not want to be separated from her.

Father arrived in the United States with M.U. on June 22, 2008. After leaving Turkey on June 20, they stopped in London, England, and stayed with a cousin for two days to ease the strain of traveling with a child. He called Mother as soon as he landed in London to let her know they had landed safely. Mother was aware of the travel plans. When they arrived in New Jersey on June 22, he again called Mother to let her know they landed safely. Other than Mother, his family also knew about the travel plans, though hers did not.

While looking for work, he and M.U. resided in Clifton, after a short time in Hamilton. The economic crisis prevented him from finding work. At the time of the hearing, he was employed as a limousine driver and dispatcher, but had recently started a company with some friends in Roselle Park. He and M.U. share a second-floor, two bedroom/two bathroom apartment in Clifton. M.U. has her own room, toys and clothes. She has medical insurance, visits the doctor, is healthy and is up to date on vaccinations.

M.U. first attended daycare before entering a charter school in first grade, where she has excelled. The school's principal reported that M.U. typically arrived on time to school and, although quiet, is a good student, well-kempt, healthy and happy, and well-adjusted. Father acknowledged that M.U. had attended pre-school in Turkey and noted that while here she attends a weekend Turkish school where she also studies the Koran.

Father testified that since being in the United States, M.U. has been in regular contact with Mother through the telephone and internet. These communications may be a couple of times per week, and as much as either one wishes. However, he agreed that M.U.'s conversations with Mother through video chatting were not the same as in-person time.

Father stated that M.U. would face a grave risk of psychological harm if returned to Turkey. This would result from her separation from Father and because Mother's family would not allow M.U. to return. Moreover, "she would be forcibly taken from her environment here. From her friends, from her school, from me. And she wants to live in the United States. She explicitly says that she wants to live in the United States. She doesn't want to go back to Turkey. And she's settled here." Also, he wants M.U. to receive a better education than that she would get in Turkey.

If M.U. were sent back, Father would stay here, owing to the life he has built. He had not returned to Turkey with M.U. because he feared that the temporary custody determination in Mother's favor would prevent him from again leaving with M.U.,

and they would be tied up in court there for years. Additionally, Father believed he would have a problem returning to Turkey because Mother's brother has threatened him, including when he came to the United States with Mother for the hearing. Father would remain here, where he knows Mother's brother could not get to him. The brother, C.B., works as a legal correspondent for a newspaper, and Father fears that C.B. will use his familiarity with prosecutors and police to have him jailed, though he admitted that had not happened before. Father acknowledged telling M.U. that if she returned to Turkey with Mother, she would not see him again until she was older.

On April 29, 2011, the trial court issued a decision and order. The trial court found M.U. to be a habitual resident of Turkey, wrongfully removed by Father. Temporary custody of M.U. was granted to Mother to take her back to Turkey for a determination of permanent custody. The trial court did not deem it necessary to examine the issue of whether M.U. was "well-settled" in the United States, as that relates to Article 12 of the Hague Convention, because M.U.'s removal was wrongful and Mother, in the trial court's estimation, had done all she could to bring the action within one year.

This [c]ourt agrees with [Mother] that the one-year provision of the Hague Convention may be equitably tolled. *See Lops v. Lops,* 140 *F.*3d 927[,] 946 (11th Cir.1998). The facts of the case at bar support such a tolling. But for the bureaucratic handling of the petition, difficulty in the U.S. Department of State finding pro bono counsel in the United States and the difficulty in [Mother] obtaining a U.S. visa and lack of finances to travel to the U.S., the application would have been filed in this court within the one year. [Mother] did everything she could to ensure it was. Even assuming this [c]ourt made a finding M.U. was "well settled" its opinion would coincide with the decision in *Belay v. Getachew,* 272 *F.Supp.*2d 553 ([D.Md.] 2003). In *Belay,* the court found that even though the petition had been filed more th[a]n one year after the abduction and the child was well settled in the new environment, the one year period should be equitably tolled. The court recognized it would be uprooting the well settled child to return to the habitual residence but that there was a legitimate concern that allowing [r]espondent's behavior to go unchecked would provide incentive to parents to take the law into their own hands, crossing international borders in reach of more sympathetic custody courts. The Hague Convention implemented by ICARA expressly seeks to prevent such action.

The trial court granted a temporary stay until 12:00 p.m. on May 2, 2011, for Father to obtain a plenary stay from the Appellate Division.

Father appealed to this court on an emergent basis seeking a stay. We granted the stay and remanded to the trial court for a supplemental opinion regarding whether the child was well-settled in the United States as that term is understood in Article 12 of the Convention. *F.H.U. v. A.C.U.*, M–006017–10 (App.Div. May 5, 2011).

In a supplemental decision, the trial court found that under Article 12, M.U. was well-settled in the United States. However, the trial court also "reiterate[d] its ruling that [Mother] did everything she could to perfect her complaint for abduction which was mishandled by the United States Department of State. It is not conceivable that the drafters of the Hague Child Abduction provisions intended a one-year bright-line test under these circumstances."

■ On February 13, 2012, a Turkish court awarded Mother full custody of M.U.[5]

On appeal, Father contends that the trial court erred by "equitably tolling the one-year provision of the Hague Convention instead of carrying out a proper well-settled analysis as required by the statute." He also argues that the trial court "relied on an inaccurate recollection of the testimony to find that there was no agreement between the parties when [Father] left Turkey with the child." Father further contends error in the trial court's finding that no grave risk existed such "that return of the child to the originating state would expose her to psychological harm and

---

[5] Mother contends that this award moots this matter. However, Article 17 of the Convention makes clear that though foreign custody determinations may be illuminative on the issue of whether a petitioner's custody rights have been breached, there is no requirement that full faith and credit be accorded them. *See, e.g., Diorinou v. Mezitis*, 237 *F*.3d 133, 146 (2d Cir.2001) (implicitly recognizing that the existence of a foreign or domestic custody award does not moot an appeal of a trial court's granting of a Hague Convention petition).

place the child in an intolerable situation." Lastly, Father posits that the trial court erred by not conducting an "in camera interview of the child either as part of its well-settled and grave risk analysis or to consider whether the child object[ed] to the return." Mother filed a cross-appeal challenging the trial court's supplemental finding that the child was well-settled.

## HAGUE CONVENTION OVERVIEW

We begin our analysis with a review of the purpose, design and processes of the Hague Convention on the Civil Aspects of International Child Abduction, Oct. 25, 1980, T.I.A.S. No. 11670, 1343 U.N.T.S. 49,[6] to which the United States and Turkey are signatories. At its core, the Convention is intended "to protect children internationally from the harmful effects of their wrongful removal or retention and to establish procedures to ensure their prompt return" and to protect access rights. *See Hague Convention,* preamble. Its twin aims are to "protect factual situations altered by the wrongful removal or retention of a child, and ... guaranteeing, in particular, respect for the legal relationships which may underlie such situations." Elisa Pérez–Vera, *Explanatory Report: Hague Conference on Private International Law,* in 3 Acts and Documents of the Fourteenth Session 426, 428 (1980).[7] Article 1 embodies those goals, setting as the Convention's objects: "a) to secure the prompt return of children wrongfully removed to or retained in any Contracting State; and b) to ensure that rights of custody and of access under the law of one Contracting State are effectively respected in the other Contracting States."

---

[6] Reprinted at 51 *Fed.Reg.* 10494 (Mar. 26, 1986).

[7] As the Hague Conference's official reporter, Ms. Pérez–Vera's report "is recognized by the Conference as the official history and commentary on the Convention and is a source of background on the meaning of the provisions of the Convention." U.S. Department of State's Legal Analysis of the Hague International Child Abduction Convention, 51 *Fed.Reg.* 10494, 10503 (Mar. 26, 1986).

Pursuant to Article 3 of the Convention, wrongful removal occurs where:

a) it is in breach of rights of custody attributed to a person, an institution or any other body, either jointly or alone, under the law of the State in which the child was habitually resident immediately before the removal or retention; and

b) at the time of removal or retention those rights were actually exercised, either jointly or alone or would have been so exercised but for the removal or retention.

The Convention applies to "any child habitually resident in a Contracting State immediately before any breach of custody or access rights," so long as the child is younger than sixteen years old. *Hague Convention*, art. 4.

Article 12 explains the role of judicial review of a Hague Convention petition.

Where a child has been wrongfully removed or retained in terms of Article 3 and, at the date of the commencement of the proceedings before the judicial or administrative authority of the Contracting State where the child is, a period of *less than one year* has elapsed from the date of the wrongful removal or retention, *the authority concerned shall order the return of the child forthwith.*

The judicial or administrative authority, *even where the proceedings have been commenced after the expiration of the period of one year* referred to in the preceding paragraph, *shall also order the return of the child, unless it is demonstrated that the child is now settled in its new environment.*

[*Hague Convention*, art. 12 (emphasis added).]

Although the Convention generally eschews a "best interests of the child" approach, *see* Pérez–Vera, *supra*, at 431, the provisions of Article 12 demonstrate the drafters' appreciation of the difficulties for children who have become settled in a new country. Thus, Article 12 utilizes a one-year period from the time the child is abducted for the commencement of proceedings [8] in the Contracting State where the child is located.

In 1988, Congress passed ICARA, the implementing legislation for the Convention, 42 *U.S.C.A.* § 11601 to –11. On April 29, 1988, the President signed ICARA and the Convention was ratified with a July 1, 1988 effective date. *See* 53 *Fed.Reg.* 23608 (June 23, 1988) (to be codified at 22 *C.F.R.* pt. 94). ICARA

---

[8] "Commencement of proceedings" means filing in the jurisdiction where the child is located. 42 *U.S.C.A.* § 11603(f)(3).

confers concurrent original jurisdiction upon federal and state courts. 42 *U.S.C.A.* § 11603(a).

ICARA follows the Convention's goal of returning the child to the status quo before the wrongful removal. Pursuant to ICARA, the purpose of a petition hearing is not to determine custody of the child or to make a best interests analysis. Rather, it is simply to ascertain whether there has been a wrongful removal and retention. *See, e.g., Loos v. Manuel,* 278 *N.J.Super.* 607, 612, 651 *A.*2d 1077 (Ch.Div.1994) (noting that Convention proceedings are to "determine in what jurisdiction the child should be physically located, so that the proper jurisdiction can make custody decisions").

■ Thus, a petitioner must first establish a prima facie case for wrongful removal. Specifically, it must be shown that the child's habitual residence was in the country from which the child was removed; the removal breached the custodial rights of the petitioner; and at the time of removal, the petitioner was exercising his or her custodial rights. *See Belay v. Getachew,* 272 *F.Supp.*2d 553, 559 (D.Md.2003).

Upon such a showing, a respondent may assert specific defenses. *Ibid.* Pursuant to Article 13, the reviewing authority is not required to order a child returned if the respondent establishes that:

a) the person, institution or other body having the care of the person of the child was not actually exercising the custody rights at the time of removal or retention, or had consented to or subsequently acquiesced in the removal or retention; or

b) there is a grave risk that his or her return would expose the child to physical or psychological harm or otherwise place the child in an intolerable situation.

The judicial or administrative authority may also refuse to order the return of the child if it finds that the child objects to being returned and has attained an age and degree of maturity at which it is appropriate to take account of its views.

In considering the circumstances referred to in this Article, the judicial and administrative authorities shall take into account the information relating to the social background of the child provided by the Central Authority or other competent authority of the child's habitual residence.

[*Hague Convention,* art. 13.]

In sum, the respondent may argue that: (1) the petitioner consented to the removal, Article 13(a); (2) a return to his or her habitual residence would subject the child to a grave risk of physical or psychological harm, Article 13(b); and/or (3) the child does not wish to be returned. Additionally, if the petition is commenced more than one year after the removal, the respondent may present evidence that the child is well-settled in his or her new environment. *Hague Convention*, art. 12.

■ However, a showing by respondent that the petition was filed more than one year after the removal and that the child is well-settled in the new environment does not automatically end the inquiry. The reviewing court still has the power to order that the child be returned to the habitual residence. *Ibid.* This is clear from Article 18, which provides that "[t]he provisions of [Articles 12 and 13] do not limit the power of a judicial or administrative authority to order the return of the child at any time."

ICARA places, on respondent the burden of proving grave risk of harm by clear and convincing evidence. 42 *U.S.C.A.* § 11603(e)(2)(A). However, the burden of proof is only by a preponderance of the evidence to prove that the child is now well-settled in his or her new home, acquiescence of the petitioning parent, or the child's objection to return. 42 *U.S.C.A.* § 11603(e)(2)(B).

### EQUITABLE TOLLING ARGUMENT

■ Father contends the trial judge erred by finding that the bureaucratic delays encountered by Mother in the petition filing process, in conjunction with her financial and travel difficulties, were sufficient to equitably toll the one-year term in Article 12, precluding a consideration of the well-settled defense. We agree with Father. Our review of cases in other jurisdictions reveals that Article 12's one-year filing term has only been equitably tolled, if at all, in situations where the respondent actively concealed their and the child's location. Here, there are no facts evincing Father's efforts at concealment.

Whether equitable tolling applies to Article 12 is an issue of first impression in New Jersey. However, many federal and state courts have considered the question and their interpretations, though not binding, are instructive. *See Tahan v. Duquette*, 259 *N.J.Super.* 328, 334, 613 *A.*2d 486 (App.Div.1992).

Courts are split on whether the one-year filing term of Article 12 may be equitably tolled. A large majority agree that it may, but only where the abducting parent has taken steps to conceal the child's location from the other parent or authorities. The rationale is that although the child may be well-settled, courts are loath to reward the abducting parent in such a way as to frustrate the purpose of the Convention. *See Duarte v. Bardales*, 526 *F.*3d 563, 570 (9th Cir.), *reh'g denied, reh'g en banc denied*, 530 *F.*3d 1151 (2008). The minority view finds no basis for equitable tolling because the one-year term is not a statute of limitations that prevents the commencement of an action under the Convention after one year. *See Anderson v. Acree*, 250 *F.Supp.*2d 872, 875 (S.D.Ohio 2002). Rather, the Convention's drafters created the time limit because, despite a wrongful removal, a return order after a significant time may work a greater wrong upon the child. *See Toren v. Toren*, 26 *F.Supp.*2d 240, 244 (D.Mass.1998), *vacated on other grounds*, 191 *F.*3d 23 (1st Cir.1999).

Courts taking the majority view routinely cite specific acts of malfeasance on the respondent's part. For example, in *Lops v. Lops*, 140 *F.*3d 927, 929 (11th Cir.), *reh'g en banc denied*, 150 *F.*3d 1199 (1998), *cert. denied*, 525 *U.S.* 1158, 119 *S.Ct.* 1068, 143 *L.Ed.*2d 71 (1999), the appellate court reviewed a case wherein the district court had equitably tolled the Article 12 one-year term where the respondent had abducted his two children to the United States contrary to a German court's custody determination. The respondent lived in the United States for two years and kept a low profile to avoid conventional tracking by authorities seeking to locate him, his mother and the children. *Id.* at 931–32. The district court had equitably tolled Article 12 because of the difficulties

conceiv[ing] of a time period arising by a federal statute that is so woodenly applied that it is not subject to some tolling, interruption, or suspension, if it is shown or demonstrated clearly enough that the action of an alleged wrongdoer concealed the existence of the very act which initiates the running of the important time period. [*Id.* at 946 (quoting the district court opinion) (internal quotation marks omitted).]

On appeal, however, the Eleventh Circuit explicitly declined to answer whether tolling might apply under ICARA, owing to the evidentiary support for the district court's finding that the children were not yet well-settled. *Ibid.*

Similarly, in *Belay, supra,* 272 *F.Supp.*2d at 564, the district court tolled Article 12 because of respondent's efforts to conceal the child from petitioner. The action commenced two years after the wrongful removal and the court found the child to be well-settled. *Id.* at 561–62. However, evidence demonstrated that the respondent made various attempts to conceal the location of the child. *Ibid.* Respondent allowed petitioner to speak to the child, but never provided any address or phone number. *Id.* at 556. Though it agreed with the notion that the Convention's drafters' intent was to prevent further harm to the child, the court held equitable tolling appropriate in light of the respondent's concerted efforts to conceal her and the child's location, making it impossible for the petitioner to commence an action. *Id.* at 563–64.

Subsequently, the Ninth and Eleventh Circuit Courts of Appeals explicitly held that concealment by the abducting parent causing the action to be commenced more than one year after removal is grounds for equitably tolling Article 12. *See Duarte, supra,* 526 *F.*3d at 570 (9th Cir.); *Furnes v. Reeves,* 362 *F.*3d 702, 723 (11th Cir.) (tolling available where "the parent removing the child has secreted the child from the parent seeking return"), *reh'g en banc denied,* 107 *Fed.Appx.* 186, *cert. denied,* 543 *U.S.* 978, 125 *S.Ct.* 478, 160 *L.Ed.*2d 355 (2004), *abrogated on other grounds, Abbott v. Abbott,* —— *U.S.* ——, 130 *S.Ct.* 1983, 176 *L.Ed.*2d 789 (2010). Other state and federal district courts have followed these holdings. *See, e.g., Perez v. Garcia,* 148 *Wash.App.* 131, 198 *P.*3d 539, 544–45 (2009) (tolled for the three days from when petitioner's child was taken until he became aware of it);

*Castillo v. Castillo*, 597 *F.Supp*.2d 432, 439 n. 11 (D.Del.2009) (recognizing that equitable tolling is available when there is evidence of concealment). It is clear that the weight of persuasive authority indicates that the doctrine of equitable tolling should only be applied to Article 12 where the delay in commencing an action results from the abducting parent's active concealment of the child's location.

Here, the trial court did not base its decision to equitably toll Article 12 on Father's malfeasance because there was no evidence of such. Indeed, it was undisputed that Father called Mother soon after arriving in the United States, and the parties and M.U. were in weekly or daily contact. Nor was it alleged that Mother was unaware of Father's location. The trial court relied on *Lops* and *Belay, supra*, as support for equitable tolling. However, as discussed above, the *Lops* court explicitly declined to rule on the district court's equitable tolling because it had also found that the children were not yet well-settled. *Lops, supra*, 140 *F.*3d at 946. When the same federal appellate court did decide the issue a few years later in *Furnes, supra*, 362 *F.*3d at 723, it allowed tolling only for concealment. And the *Belay* court's tolling was also expressly predicated on the respondent's concealment. 272 *F.Supp*.2d at 564.

Because there was no evidence that Father had sought to hide M.U. from Mother, the trial court's basis for tolling was, instead, the delay caused by the "bureaucratic handling of the petition, difficulty in the United States Department of State finding pro bono counsel in the United States and the difficulty in [Mother] obtaining a United States visa and lack of finances to travel to the United States." Therefore, the question becomes whether Article 12 may be equitably tolled when the acts of third parties necessary to implement the Convention's processes result in the action being brought beyond one year. In light of the intent of the drafters, we hold that it does not.

The Pérez–Vera Report provides an in-depth analysis of the Convention's drafting history. Article 12's drafters were con-

cerned with how to set a period of time during which a child was to be summarily returned. Pérez–Vera, *supra*, at 458.

The problem is an important one since, in so far as the return of the child is regarded as being in its interests, it is clear that after a child has become settled in its new environment, its return should take place only after an examination of the merits of the custody rights exercised over it—something which is outside the scope of the Convention. Now, the difficulties encountered in any attempt to state this test of 'integration of the child' as an objective rule resulted in a time-limit being fixed which, *although perhaps arbitrary*, nevertheless proved to be the 'least bad' answer to the concerns which were voiced in this regard. [*Ibid.* (emphasis added).]

The drafters also explicitly contemplated "potential delays in acting on the part of competent authorities," and determined that in those situations, "the judicial or administrative authorities must order the return of the child forthwith, unless they aver the existence of one of the exceptions provided for in the Convention itself." *Id.* at 459. Additionally, the drafters wanted to "lessen the consequences which would flow from the adoption of an inflexible time-limit beyond which the provision of the Convention could not be invoked. The solution finally adopted[ ] plainly extends the Convention's scope by maintaining indefinitely a real obligation to return the child." *Ibid.* (citation omitted). This demonstrates that the drafters of the Convention were certainly aware of the types of potential delays concomitant with the filing of a petition that necessarily requires the participation of government officials and agencies in multiple countries. Despite that, they settled on a filing term of one year.

Some courts have noted the absence of authority for equitable tolling for bureaucratic delay and thus refused to consider the question. *See, e.g., Stevens v. Stevens*, 499 *F.Supp.*2d 891, 896 (E.D.Mich.2007).

The Convention and ICARA are silent on tolling. Regarding the application of equitable tolling to statutes that are otherwise silent, the United States Supreme Court has held that "limitations periods are 'customarily subject to equitable tolling,' unless tolling would be 'inconsistent with the text of the relevant statute.'" *Young v. United States*, 535 *U.S.* 43, 49, 122 *S.Ct.* 1036, 1040, 152

*L.Ed.*2d 79, 86 (2002) (citations and internal quotation marks omitted) (quoting *Irwin v. Dep't of Veterans Affairs,* 498 *U.S.* 89, 95, 111 *S.Ct.* 453, 457, 112 *L.Ed.*2d 435, 444 (1990); *United States v. Beggerly,* 524 *U.S.* 38, 48, 118 *S.Ct.* 1862, 1868, 141 *L.Ed.*2d 32, 41 (1998)).

■ Equitable tolling is traditionally reserved for limited occasions. These include: "(1) [if] the defendant has actively misled the plaintiff, (2) if the plaintiff has 'in some extraordinary way' been prevented from asserting his rights, or (3) if the plaintiff has timely asserted his rights mistakenly in the wrong forum," with the caveat that any restrictions on tolling "must be scrupulously observed." *Kocian v. Getty Ref. & Mktg. Co.,* 707 *F.*2d 748, 753 (3d Cir.1983) (quoting *Sch. Dist. v. Marshall,* 657 *F.*2d 16, 19–20 (3d Cir.1981)). Although these considerations are instructive, they apply to statutes of limitations periods that, if not tolled, cut off a litigant's ability to seek relief under a particular statute. *See, e.g., Villalobos v. Fava,* 342 *N.J.Super.* 38, 52, 775 *A.*2d 700 (App.Div.) ("Equitable tolling affords relief from inflexible, harsh or unfair application of a statute of limitations . . . ."), *certif. denied,* 170 *N.J.* 210, 785 *A.*2d 438 (2001).

Here, Article 12's one-year filing term does not function to bar a litigant from bringing a claim under the Convention or ICARA. Contrary to Mother's argument, it is not a statute of limitations, because the expiration of the one-year term places no limit on a petitioner's ability to commence an action under the Convention. Rather, after one year a court is simply permitted to consider the impact of return on the child, something it would otherwise have no jurisdiction to examine.

Mother also argues that Father's refusal to provide her financial assistance to come to this country to commence the action demonstrates sufficient malfeasance equivalent to concealment to justify equitable tolling. However, if tolling is unavailable for bureaucratic delays, then it must also be so on the basis of indigency.

■ In conclusion, the trial court erred in equitably tolling Article 12's one-year term on the basis of bureaucratic delays encountered by Mother. In accord with the Convention drafters' intent and the great weight of case law, we hold that Article 12's one-year filing term may be equitably tolled only where the respondent's efforts at concealment prevent the petitioner from timely commencing an action. However, it does not follow from this holding, paired with the trial judge's finding that M.U. is well-settled, that M.U. cannot and should not be ordered returned to Turkey.

### EFFECT OF DELAY IN FILING PETITION

Where a Hague Convention petition has been filed more than a year from the wrongful removal, the respondent may make a showing, by a preponderance of the evidence, that the child is well-settled in his or her new country and should not be returned. *Hague Convention*, art. 12. To that end, Father contends that because Mother's action was commenced in New Jersey in December 2010—beyond one year from the June 2008 wrongful removal—and the trial court found that M.U. was well-settled, the trial court's return order should be vacated.

■ Following the trial judge's supplemental opinion on remand finding M.U. to be well-settled, Mother filed a cross-appeal on that issue. However, her brief is bereft of any argument challenging that finding. Father posits that this failure effectively waives Mother's cross-appeal.

■ We agree that petitioner's cross-appeal is waived, *R.* 2:6-2(d), and are satisfied with the trial court's conclusion that M.U. was well-settled in the United States. But we disagree that such a showing requires vacating the order returning M.U. to Turkey.

The Pérez–Vera report's analysis of Article 12 is again instructive in divining the drafters' intent. It explains that Article 12 should be read in harmony with Article 18. Pérez–Vera, *supra*, at 460. Article 18 declares that "[t]he provisions of this Chapter do

not limit the power of a judicial or administrative authority to order the return of the child at any time." [9] Therefore, Article 18 "authorizes the competent authorities to order the return of the child by invoking other provisions more favourable to the attainment of this end." Pérez–Vera, *supra*, at 460. The drafters recognized that

> [t]his may happen particularly in the situations envisaged in the second paragraph of article 12, i.e. where, as a result of an application being made to the authority after more than one year has elapsed since the removal, the return of the child *may* be refused if it has become settled in its new social and family environment. [*Ibid.* (emphasis added).]

Thus, finding a child to be well-settled does not render a court powerless to order the child returned. Considering this same issue, the Second Circuit Court of Appeals observed that Article 12 "allows—but does not, of course, require—a judicial or administrative authority to refuse to order the repatriation of a child on the *sole* ground that the child is settled in its new environment. . . ." *Blondin v. Dubois*, 238 *F.*3d 153, 164 (2d Cir.2001). Other courts have agreed, noting that "'the court retains the discretion to order the return of the child if it would further the aim of the Convention which is to provide for the return of a wrongfully removed child.'" *Yang v. Tsui*, 499 *F.*3d 259, 278 (3d Cir.2007) (quoting *de Silva v. Pitts*, 481 *F.*3d 1279, 1285 (10th Cir.2007)).

We find this to be the correct reading, especially in light of the Pérez–Vera report's commentary. Therefore, although Father has made a showing that M.U. is well-settled, that in itself is not a bar for the Law Division to exercise its residual discretion and order the return of M.U.

In the first opinion, the trial court gave its reasons for finding that, at the heart of the matter, M.U. was wrongfully removed under Article 3. These findings reflected its determination of Father's credibility and influenced its conclusion that M.U. should be returned to Turkey.

---

[9] Article 18 is within Chapter III, which contains Articles 8–20.

When [Mother] testified in this court she was upset and crying. Her demeanor was what one would expect of a mother whose child was abducted by its father[.] In contrast[, Father's] demeanor was calculating. His demeanor and his testimony leads this court to find that he unilaterally made a best interest determination for M.U. to relocate to the United States. This [c]ourt believes he was going to do this with or without [Mother's] consent.

These credibility determinations are central to an adjudication of the narrow issue that the trial court had jurisdiction to decide—whether M.U. was wrongfully removed.

Moreover, in its supplemental decision addressing M.U.'s well-settled status, the trial court acknowledged the many positive aspects of her life in New Jersey, from academic performance to her periodic pet store visits to add goldfish to her aquarium. Nonetheless, having heard Mother's and Father's testimony the trial court recognized that the appropriate analysis in a Hague Convention case is not the "best interests of the child," but whether M.U. was removed wrongfully.

At its essence, the Convention seeks to right a wrong by returning the factual situation to the status quo ante a child's removal. As an agreement among sovereign nations regarding their most precious resource, the Convention resolves to ensure that permanent custody determinations are made solely through the legal procedures of a child's habitual residence. This necessarily may occasion austere results, but such is the nature of an international accord that endeavors to streamline the varied and disparate procedures of its signatory nations. Just as the Convention's drafters were cognizant of potential transactional delays, they also sought to minimize the impact of one nation's legal processes upon another.

By ordering that M.U. be returned based on the circumstances of her removal, and with appreciation of her time, experiences and relationships during her time here, the trial court properly exercised its discretion to make factual findings within its realm of expertise while upholding the Convention's prime purpose.

## HAGUE CONVENTION DEFENSES

Father's remaining avenues for challenging the return order come from the defenses carved out in Article 13. Father contends that the trial court erred in failing to find that he rebutted Mother's prima facie case for wrongful removal through the Convention's Article 13 defenses that the removal was consensual, that there exists a grave risk of harm to the child if returned, or that the child wishes to remain here. We disagree.

Father argues that the trial court erred in its finding that Mother had not consented to the child's removal. Mother contends that although there may have been an agreement between the parties to take M.U. to Italy, there was no such agreement to allow Father to unilaterally take her to the United States.

■ The trial judge's finding that a parent acquiesced in the removal of the child is reviewed for abuse of discretion. The application of that finding to the court's interpretation of Article 13(a) is a legal conclusion reviewed de novo.

■ Article 13(a) provides a defense to a finding of wrongful removal where the petitioning parent is alleged to have abdicated his or her custody over the child, or agreed to allow the child to be removed by the respondent parent. *Hague Convention*, art. 13(a). The burden is on the respondent to demonstrate such acquiescence by a preponderance of the evidence. 42 *U.S.C.A.* § 11603(e)(2)(B). Courts have noted that in determining agreement or acquiescence to remove a child, the analysis goes beyond whether or not a temporary removal was agreed upon. "Article 13(a) does not provide that if a parent consents to removal of the child for a period, under certain conditions or circumstances, that retention of the child beyond those conditions or circumstances is necessarily permissible." *Baxter v. Baxter*, 423 *F*.3d 363, 370 (3d Cir.2005). Moreover, "[i]f the petitioner agrees to a removal under certain conditions or circumstances and contends those conditions have been breached, the court must also examine any wrongful retention claim." *Id.* at 371.

 Here, Father argues that the history of the parties' relationship evinced a general understanding that they had an agreement to eventually move to the United States. To wit, he points to Mother's knowledge that he was in the visa lottery for eleven years, and the parties' traveling to this country to have M.U. We owe special deference to the factfinding of Family Part judges in light of their expertise in such matters. *Cesare v. Cesare*, 154 *N.J.* 394, 413, 713 *A.2d* 390 (1998). Thus, in light of Mother's testimony regarding her initial reaction to the abduction, her attempts to locate Father and M.U., and her compelling testimony throughout the hearing, we have no cause to find an abuse of discretion in the trial court's ruling that Father failed to meet his burden to show acquiescence by Mother.

 Father argues that the trial court erred in concluding that the only cognizable harm pertinent to an analysis under Article 13(b)'s exception for grave risk of harm to the child if returned is that presented by the receiving state, rather than individual family members. Father contends that testimony indicated that the severe rift between the two families would wreak psychological harm on M.U. if she were returned to Turkey.

Mother concedes that the trial court erred in its articulation of the standard as grave risk at the hands of the State, but nonetheless argues that Father failed to meet his burden to prove: that Mother would harm M.U.; that M.U. had been abused; or that M.U. would be abused in Mother's home if returned. Moreover, Father did not provide expert testimony to substantiate the claimed risk of psychological harm to M.U. We agree.

 We review for plain error a trial court's fact-finding as to whether a child would suffer grave risk of physical or psychological harm if returned, and de novo the legal conclusion that the facts would constitute grave risk under Article 13(b). *See Blondin, supra,* 238 *F.*3d at 158. Respondent bears the burden of proof by clear and convincing evidence. 42 *U.S.C.A.* § 11603(e)(2)(A).

In harmony with the Convention's goals, the Pérez–Vera report describes the Article 13 defenses as a grant of judicial discretion to decline to order a child returned, rather than imposing a duty to do so. *Pérez–Vera, supra,* at 460. In particular, Article 13(b)'s language was born of a "fragile compromise" made early in the deliberative drafting process. *Id.* at 461. Thus, there is no inference "from the rejection ... of proposals favouring the inclusion of an express provision stating that this exception could not be invoked if the return of the child might harm its economic or educational prospects,[ ] that the exceptions are to receive a wide interpretation." *Ibid.* (citation omitted). Put simply, the Article 13 defenses are to be construed narrowly.

In *Tahan v. Duquette,* 259 *N.J.Super.* 328, 335, 613 *A.2d* 486 (App.Div.1992), we distinguished an Article 13(b) grave risk analysis from the type performed in a traditional custody hearing. Recognizing that the Convention requires "more than a cursory evaluation of the home jurisdiction's civil stability" and that country's court's availability to rule on custody, we noted that the Convention reserves for that country a consideration of "[p]sychological profiles, detailed evaluations of parental fitness, evidence concerning lifestyle and the nature and quality of relationships." *Id.* at 334, 613 *A.2d* 486. Nonetheless, "in order to determine whether a realistic basis exists for apprehensions concerning the child's physical safety or mental well-being, [courts] must be empowered to evaluate the surroundings to which the child is to be sent and the basic personal qualities of those located there." *Id.* at 335, 613 *A.2d* 486.

This evaluation of grave risk has been circumscribed to two situations by a number of federal appellate courts.

> First, there is a grave risk of harm when return of the child puts the child in imminent danger ... *e.g.,* returning the child to a zone of war, famine, or disease. Second, there is a grave risk of harm in cases of serious abuse or neglect, or extraordinary emotional dependence, when the court in the country of habitual residence, for whatever reason, may be incapable or unwilling to give the child adequate protection.

[*Friedrich v. Friedrich,* 78 *F.*3d 1060, 1069 (6th Cir.1996).]

*Accord Baxter v. Baxter,* 423 *F.*3d 363, 373 (3d Cir.2005). The Second Circuit described the exception as follows:

> At one end of the spectrum are those situations where repatriation might cause inconvenience or hardship, eliminate certain educational or economic opportunities, or not comport with the child's preferences; at the other end of the spectrum are those situations in which the child faces a real risk of being hurt, physically or psychologically, as a result of repatriation. The former do not constitute a grave risk of harm under Article 13(b); the latter do.
>
> [*Blondin, supra,* 238 *F.*3d at 162.]

Here, the trial court found no evidence of grave risk of harm to M.U. if returned to Turkey. Although it was clear that the families did not get along well, that alone did not constitute grave risk. The trial court also held that because the proper inquiry was whether the risk of harm was "at the hands of the State, not at the hands of the [Mother]," Father had not met his burden to show that M.U. would "face[ ] harm from the Turkish government or that she will be placed in an intolerable situation by them."

 The trial court erred in its consideration of only the risk of harm to M.U. from the Turkish government. The body of case law instructs that although the proper analysis may include evidence of the domestic situation as it pertains to wars, poverty and disease, it is also appropriate to consider any psychological or physical harm posed by family members in the country of habitual residence.

 In light of the record, however, we conclude that this is harmless error. The trial court included in its discussion of the record Father's contentions of disagreements between Father and Mother's family, especially since the abduction. However, Father presented no evidence, other than his own opinion, to support his claim that these disagreements would cause harm to M.U. He did not present any testimony by a clinical psychologist. His most tenable argument is his fear that M.U. will have limited educational options in Turkey because Mother's family only allowed Mother to receive a fifth-grade education. Nonetheless, we agree with other courts and the Pérez–Vera report that the diminution of available educational opportunities does not present a "grave risk"

of physical or psychological harm under the Hague Convention. *Blondin, supra,* 238 *F.*3d at 162.

 Father contends that prior to making its findings that she was well-settled in the United States, the trial judge should have conducted an in camera interview with M.U. to see if she wanted to stay here. Mother contends that because the substantive law of the jurisdiction is applied to issues of family law, such as this, New Jersey's court rules and case law grant a judge discretion in choosing to conduct an in camera interview of a young child. We agree.

 We review for plain error a trial judge's decision whether a subject child in a Hague Convention petition possesses the requisite age and maturity to require an in camera determination of where they wish to live. *See Tahan, supra,* 259 *N.J.Super.* at 335, 613 *A.*2d 486.

The final paragraph of Article 13 provides that the reviewing authority "may also refuse to order the return of the child if it finds that the child objects to being returned and has attained an age and degree of maturity at which it is appropriate to take account of its views." It does not, however, specify any age cut-off beyond the Convention's general application to children under sixteen years old. *See Hague Convention,* art. 4. The Pérez–Vera report noted that this provision "could prove dangerous if it were applied by means of the direct questioning of young people who may admittedly have a clear grasp of the situation but who may also suffer serious psychological harm if they think they are being forced to choose between some parents." Pérez–Vera, *supra,* at 433. It also observed that "all efforts to agree on a minimum age at which the views of the child could be taken into account failed, because all the ages suggested seemed artificial, even arbitrary. It seemed best to leave the application of this clause to the discretion of the competent authorities." *Ibid.*

In *Tahan, supra,* 259 *N.J.Super.* at 335, 613 *A.*2d 486, we held that a trial judge's decision not to conduct an in camera interview

with a child subject to a Hague petition was not plain error. The child was nine years old, an age the court determined did not meet that described in Article 13. *Ibid.* Additionally, the comment to *Rule* 5:8–6, which governs in camera interviews of children, notes that the trial judge's decision to conduct one is discretionary. Pressler & Verniero, *Current N.J. Court Rules*, comment 1.4.3 on *R.* 5:8–6 (2012).

■ Here, the trial court did not err in choosing not to interview a nine-year-old M.U. Father acknowledged telling her that if she were to return to Turkey she would not see him again until she was an adult. This is precisely the situation the Convention's drafters sought to mitigate against, and why the Convention reposes in the reviewing court the decision to interview a subject child.

Summarizing, we affirm the trial court's order returning M.U. to her habitual residence of Turkey from which she was wrongfully removed. However, because the trial court erred in its application of equitable tolling to Article 12, and its conclusion that Article 13(b)'s grave risk defense applies only to potential domestic, rather than familial, sources of harm, we must express our disagreement with those portions of the decision. *Cf. Isko v. Planning Bd. of Livingston,* 51 *N.J.* 162, 175, 238 *A.*2d 457 (1968) (noting that an order will be affirmed on appeal if it is correct, even if aspects of the trial court's reasoning are not adopted).

The judgment is affirmed. The matter is remanded to the Family Part in order to arrange the expeditious transfer of physical custody of M.U. to her mother under the terms of the April 29, 2011 order, which the Family Part judge may modify if necessary. We do not retain jurisdiction.