70 A.3d 680

BRIAN HEYERT, JUDE NOEL, DIANA WEINER, PETER SCHOEPE, JR., AND KARL MAWHINNEY, PLAINTIFFS–RESPONDENTS/CROSS–APPELLANTS, v. MENASSIE TADDESE AND YAYINE MELAKU, DEFENDANTS–APPELLANTS/CROSS–RESPONDENTS, AND HOBOKEN RENT LEVELING & STABILIZATION BOARD, DEFENDANTS–RESPONDENTS.

———

YAYINE MELAKU AND MENASSIE TADDESE, PLAINTIFFS–APPELLANTS, v. HOBOKEN RENT LEVELING & STABILIZATION BOARD AND THE CITY OF HOBOKEN, DEFENDANTS–RESPONDENTS.

Superior Court of New Jersey
Appellate Division

Argued April 29, 2013—Decided June 25, 2013.

400

Before Judges PARRILLO, SABATINO and FASCIALE.

*Richard W. Mackiewicz, Jr.*, argued the cause for appellants/cross-respondent (*Mackiewicz & Associates, L.L.C.*, attorneys; *Mr. Mackiewicz*, on the brief).

*Cathy C. Cardillo* argued the cause for respondents/cross-appellants Brian Heyert, Jude Noel, Diana Weiner, Peter Schoepe, Jr. and Karl Mawhinney.

*Victor A. Afanador* argued the cause for respondents Hoboken Rent Leveling & Stabilization Board and the City of Hoboken

*(Lite DePalma Greenberg, L.L.C,* attorneys; *Mr. Afanador,* of counsel; *Susana Cruz Hodge* and *Marissa L. Quigley,* on the brief).

The opinion of the court was delivered by

PARRILLO, P.J.A.D.

This appeal arises from a landlord-tenant dispute. The tenants, plaintiffs Brian Heyert, Jude Noel, Diana Weiner, Peter Schoepe, Jr., and Karl Mawhinney (collectively tenants), claimed that the landlords, defendants Menassie Taddese and Yayine Melaku, violated the New Jersey Consumer Fraud Act (CFA), *N.J.S.A.* 56:8-1 to –195, by charging rent in excess of that allowed by local rent control ordinances, and that the municipality erred in granting the landlords a hardship rent increase. The landlords claimed that the municipality's rent control ordinance is unconstitutional and that the legal base rent calculated under the ordinance was arbitrary, capricious and unreasonable.

At a hearing on the parties' respective actions in lieu of prerogative writs, the court vacated the hardship rent increase and dismissed the landlords' challenge to the legal base rent calculations. Later, in ruling on motions for summary judgment, reconsideration, clarification, and attorney fees, the court dismissed the landlords' constitutional claims against the municipality, and found in favor of the tenants on their CFA claim. The court entered final judgment in favor of the tenants for treble the amount of excess rent of $59,466, and for attorney fees and costs.

On appeal, the landlords argue that the court erred in finding the CFA to be applicable to this dispute. Further, they contend that even if the CFA were applicable, the court erred in finding that there were no genuine issues of material fact as to their violation of it. The landlords also assert error in the court's dismissal of their constitutional claims, its refusal to entertain their challenge to the legal base rent calculation, and its reversal of the hardship rent increase. Finally, they claim that the attorney fees awarded by the court were excessive.

■ By way of background, the Caparra homes project was built in Hoboken in 1985 as part of a federally-subsidized and city-managed program to provide home ownership opportunities to persons with moderate incomes and rental opportunities to those with low incomes. Buyers of the project's two-family homes received a down payment of $15,000 in exchange for a twenty-year commitment to rent the home's upper unit to a Section 8[1] eligible family pursuant to a Housing Assistance Payments (HAP) contract. The HAP contracts began to expire in 2005, at which time the rental units became subject to the City's Municipal Rent Control Ordinance.[2]

Landlords Melaku and Taddese (collectively landlords) are husband and wife. They purchased their first Caparra home, located at 90 Grand Street, in May 2005. After the HAP contract on that property expired in June 2005, the landlords notified their upstairs tenant that they would be raising his rent by twenty-eight percent. The tenant complained to the Division Chief of the Hoboken Rent Leveling & Stabilization Board (Board), who notified the landlords that they were only entitled to increase the rent by 3.4% in accordance with the City's rent control ordinance. According to

---

[1] The Section 8 housing assistance program, which was established by the Housing and Community Development Act of 1974, 42 *U.S.C.A.* § 1437f, "authorizes the Secretary of the Department of Housing and Urban Development (HUD) to enter into annual contribution contracts with local public housing authorities so that they may make assistance payments to owners of existing dwelling units." *Franklin Tower One, L.L.C. v. N.M.*, 157 *N.J.* 602, 608, 725 *A.2d* 1104 (1999).

[2] The City of Hoboken maintains a rent control ordinance for the purpose of stabilizing rents within the City. The Ordinance controls the rents at a base level, but allows for rent increases under a variety of provisions, including § 155–14, providing for a hardship rental increase if the landlord cannot meet operating expenses or does not make a fair return on his investment. A tenant may request a legal rent calculation from the City's rent regulation officer. Any excess rents charged by a landlord in violation of the Ordinance must be refunded or credited to the tenant. Pursuant to § 155–23, a party may appeal the decision of a rent regulation officer to the City's Rent Leveling & Stabilization Board within twenty days of the rent regulation officer's decision.

Melaku, this incident made her and Taddese "keenly aware of rent control."

On October 16, 2006, the landlords purchased a second Caparra home, located at 81 Adams Street, for $955,000. During the winter and spring of 2007, the property was extensively renovated and improved.

On June 27, 2007, the landlords entered into a one-year lease with Heyert, Noel and Weiner, effective July 1, 2007, for "the apartment located at *81 Adams Street, Unit 2 and Parking Spot # 3* referred to hereafter as 'the Apartment.'" The total monthly rent for the apartment was set at $4000 and the tenants were required to pay a $6000 security deposit.

On July 20, 2007, the landlords converted the two units at 81 Adams Street into condominiums. The landlords did not inform the tenants of the condominium conversion nor did they register Unit 2 with the rent leveling office. In August 2007, the landlords sold Unit 1 and used the proceeds of the sale to pay off their mortgage on the entire 81 Adams Street property. In April 2008, however, the landlords took out a new mortgage on Unit 2, in the amount of $417,000.

During the summer of 2008, Weiner's tenancy ceased, and that of Schoepe and Mawhinney began. In July 2008, the landlords raised the rent for Unit 2 to $4100 per month; in July 2009, they decreased the rent to $3900 per month.

On August 18, 2009, the tenants filed a request for a legal rent calculation with the Division of Rent Leveling and Stabilization. On September 21, 2009, the Board's Division Chief notified the landlords that the legal base rent for the apartment was $2086 per month and that "if a tenant has been overcharged in rent, such excess rent shall be *refunded or credited* to the tenant by the landlord forthwith." The landlords were also notified that they had twenty days to appeal the legal base rent determination.

The landlords filed their rent appeal on November 12, 2009, well outside of the twenty-day limitation period. The appeal was

considered by the Board at its meeting on December 9, 2009, and denied by a unanimous vote.

On December 11, 2009, the landlords amended their 2009 rent control registration statement for the apartment to indicate for the first time that $400 of the $3900 rent was for a parking surcharge. The tenants deny that they ever paid $400 for parking, claiming that parking was included for free in the monthly rent, and citing two email messages from Melaku in May 2007 in which she first offered to give the tenants parking for $125 per month for a total rent of $4125, and later said that she would not charge for parking and the total rent would be $4000.

On December 22, 2009, the landlords filed an application for a hardship rent increase that was heard at the Board meeting on January 13, 2010. On January 27, 2010, the Board issued a resolution approving a hardship increase of $1962, allowing a total rent of $4048. The Board denied the landlords' request that the increase be made retroactive, however, and ruled that "all increases would be prospective." On January 29, 2010, the Division Chief notified the landlords that the hardship application had been granted and that they must serve the tenants with thirty-days notice' of the rental increase.

On February 4, 2010, the tenants agreed to settle with the landlords for a reduced sum. In exchange for notarized releases of their claims, the tenants received checks from the landlords for amounts varying between $6000 and $12,000. When deposited, however, the checks were returned for insufficient funds.

On February 11, 2010, Taddese sent an email message to the tenants asserting that the settlement agreement was not binding. On February 17, 2010, he sent a message stating that the proper base rent combined with the tax surcharge might well amount to more than the rent that was charged and warning that the tenants must "come to some agreement based on these new realities." [3]

---

[3] Meanwhile, on February 9, 2010, the landlords filed a request with the Board for an update of the legal base rent calculation. On March 17, 2010, they wrote

Thereafter, both parties filed actions in lieu of prerogative writs in the Law Division. On March 3, 2010, the tenants filed a complaint against the landlords and the Board, asserting claims against the landlords for overcharging rent, violating the CFA, and violating the Rent Security Deposit Act (RSDA), *N.J.S.A.* 46:8–19 to –26, and against the Board for erroneously granting the landlords' request for a hardship rent increase.

Days later, on March 15, 2010, the landlords filed a complaint against the Board and the City of Hoboken, claiming that the Board acted arbitrarily, capriciously, and unreasonably in approving an erroneous base rent calculation for their rental unit, that the City's rent control ordinance was unconstitutionally vague and void in its application, and that the actions of the City and the Board deprived them of their civil rights under 42 *U.S.C.A.* § 1983. A later amendment added claims for due process violations and a regulatory taking of the landlords' property.

The two complaints were consolidated and various motions followed. On August 13, 2010, the Law Division judge vacated the Board's grant of a hardship rent increase to the landlords and remanded the landlords' hardship application to the Board for reconsideration; dismissed the landlords' action in lieu of prerogative writs in its entirety, finding that the landlords' claims were untimely and that none of the Board's actions were outside the scope of its authority; and denied the tenants' motion for summary judgment as premature and therefore without prejudice.

---

to the City asking that a base rent determination letter from April 18, 2005, be "deleted" because the calculations therein were incorrect.

A letter dated March 30, 2010, from the City's Office of Corporation Counsel informed the landlords that their request to appeal the legal rent calculation was denied, and further, that any appeal of the April 18, 2005 determination was untimely. The landlords sought review from the Board, and on April 13, 2010, the Board's Division Chief wrote to the landlords stating that the Board did "not have the authority to hear appeals on opinions made by the Board attorney."

On April 21, 2010, the landlords bought a third Caparra home, located at 1242 Garden Street, for $940,000.

On cross-motions for reconsideration, the court, by orders of October 7, 2010, revised its August 13, 2010 order to clarify that the landlords' constitutional claims were preserved, but denied the landlords' motion to reconsider the dismissal of their challenge to the Board's base rent calculation.

On December 23, 2010, the tenants renewed their motion for summary judgment on their excessive rent, RSDA, and CFA claims. The City joined this motion, seeking summary judgment on the landlords' constitutional claims. Following argument, the judge granted summary judgment in favor of the City and Board on all of the landlords' constitutional claims, and in favor of the tenants on their excess rent claim, but denied summary judgment on the tenants' claims under the RSDA and the CFA. On cross-motions for reconsideration, the judge granted summary judgment in the tenants' favor on their CFA claim, but refused to reconsider her denial of summary judgment on the RSDA claim.

A conforming order was entered granting judgment in favor of the tenants for treble excess rents in addition to attorney fees and costs. Thereafter, the tenants submitted an affidavit of fees and costs in which they expressly waived their claim under the RSDA. On May 4, 2011, the judge entered an order granting the tenants $178,398 for treble damages under the CFA, $29,112.75 for reasonable attorney fees, and $738.32 for costs.

This appeal follows in which the landlords raise the following issues:

I. DID THE COURT ERR BY GRANTING SUMMARY JUDGMENT IN FAVOR OF THE TENANTS ON THEIR CONSUMER FRAUD ACT?

A. DID THE COURT ERR BY CONCLUDING THAT THE LANDLORDS WERE IN THE BUSINESS OF RENTING PROPERTY?

B. DID THE LANDLORDS COMMIT AN AFFIRMATIVE ACT OF UNLAWFUL CONDUCT BY CHARGING RENT IN EXCESS OF THAT ALLOWED BY THE MUNICIPAL RENT CONTROL ORDINANCE?

C. DID THE TENANTS PROVE THAT THEY SUFFERED AN ASCERTAINABLE LOSS AND DID THE COURT CALCULATE THE AMOUNT OF THAT LOSS PROPERLY?

D. DID THE TENANTS PROVE THAT THEIR DAMAGES WERE CAUSED BY THE LANDLORDS' UNLAWFUL ACT?

II. DID THE COURT ERR BY DISMISSING THE LANDLORDS' FACIAL AND AS-APPLIED CHALLENGES TO THE VALIDITY OF THE HOBOKEN RENT CONTROL ORDINANCE?

III. DID THE COURT ERR BY DISMISSING THE LANDLORDS' ACTION IN LIEU OF PREROGATIVE WRITS CHALLENGING THE BOARD'S BASE RENT CALCULATION?

IV. DID THE COURT ERR BY VACATING AND REMANDING THE HARDSHIP INCREASE GRANTED TO THE LANDLORDS, AND DID THE BOARD ERR IN REFUSING TO APPLY THE INCREASE RETROACTIVELY?

V. DID THE COURT ERR BY DISMISSING THE LANDLORDS' CLAIMS FOR CIVIL RIGHTS VIOLATIONS, IMPAIRMENT OF CONTRACT, AND REGULATORY TAKING?

 A. DID THE COURT ERR BY FINDING THAT THE LANDLORDS' CLAIMS UNDER 42 *U.S.C.* § 1983 WERE TIME-BARRED?

 B. DID THE COURT ERR BY FINDING THAT THE LANDLORDS' TAKINGS CLAIM LACKED LEGAL MERIT?

VI. DID THE COURT ERR IN ITS AWARD OF ATTORNEY FEES TO THE TENANTS?

VII. ARE THE TENANTS JUDICIALLY ESTOPPED FROM ENFORCING THE JUDGMENT ENTERED BELOW?

VIII. IF THIS MATTER IS REMANDED TO THE TRIAL COURT, SHOULD PROCEEDINGS BE STAYED PENDING THE OUTCOME OF A PENDING CLASS ACTION LAWSUIT?

IX. IF THIS MATTER IS REMANDED TO THE TRIAL COURT, SHOULD DISCOVERY BE REOPENED?

## I.

We first address the application of the CFA in light of the landlords' multi-pronged argument it does not pertain to them because they are not professional sellers and the tenants suffered no ascertainable loss, but that even if applicable, there are genuine issues of material fact as to their liability given their claimed reliance on attorney advice.

The court below reviewed the proofs required for a successful CFA claim as set forth in *Strawn v. Canuso,* 140 *N.J.* 43, 60, 657 *A.*2d 420 (1995), *Cox v. Sears Roebuck & Co.,* 138 *N.J.* 2, 18, 647 *A.*2d 454 (1994), and *49 Prospect Street Tenants Ass'n v. Sheva Gardens, Inc.,* 227 *N.J.Super.* 449, 468, 547 *A.*2d 1134 (App.Div. 1988). Relying on *Wozniak v. Pennella,* 373 *N.J.Super.* 445, 862

A.2d 539 (App.Div.2004), *certif. denied,* 183 *N.J.* 212, 871 A.2d 90 (2005), the court observed that "there is no scienter requirement in order to trigger liability under the Consumer Fraud Act." Thus, it found that "any knowledge or intent on the part of the Landlords is irrelevant for purposes of determining whether Landlords violated the Consumer Fraud Act." It further found that the landlords knew about the rent control ordinance, charged rent in excess of that ordinance, and were in the business of renting apartments. It concluded that no genuine issue of material fact existed as to whether the landlords made an affirmative misrepresentation by raising the rents in violation of the ordinance, and that the tenants were therefore entitled to summary judgment on their CFA claim. We agree.

On appeal, we review a summary judgment decision de novo, applying the same legal standard as the trial court in determining whether the grant or denial of summary judgment was correct. *Hinton v. Meyers,* 416 *N.J.Super.* 141, 146, 3 A.3d 601 (App.Div. 2010); *Antheunisse v. Tiffany & Co., Inc.,* 229 *N.J.Super.* 399, 402, 551 A.2d 1006 (App.Div.1988), *certif. denied,* 115 *N.J.* 59, 556 A.2d 1206 (1989). Of course, summary judgment is appropriate where "there is no genuine issue as to any material fact challenged and ... the moving party is entitled to a judgment or order as a matter of law." *R.* 4:46–2(c).

### (A) The CFA

The CFA provides a remedy for any consumer who has suffered an ascertainable loss of moneys or property as a result of an unlawful commercial practice and allows him or her to recover treble damages, costs, and attorneys fees. *Lee v. First Union Nat'l Bank,* 199 *N.J.* 251, 257, 971 A.2d 1054 (2009) (citing *N.J.S.A.* 56:8–19); *Gennari v. Weichert Co. Realtors,* 148 *N.J.* 582, 604, 691 A.2d 350 (1997); *Cox, supra,* 138 *N.J.* at 17, 647 A.2d 454. To fully advance the Act's remedial purposes, courts construe its provisions broadly and liberally in favor of consumers. *Lee, supra,* 199 *N.J.* at 257–58, 971 A.2d 1054; *Papergraphics Int'l, Inc. v. Correa,* 389 *N.J.Super.* 8, 12, 910 A.2d 625 (App.Div.2006);

*Skeer v. EMK Motors, Inc.*, 187 *N.J.Super.* 465, 470, 455 *A.*2d 508 (App.Div.1982).

Unlawful practices fall into three general categories: affirmative acts, knowing omissions, and violations of regulations promulgated pursuant to the statute. *Allen v. V. & A Bros., Inc.*, 208 *N.J.* 114, 131, 26 *A.*3d 430 (2011); *Int'l Union of Operating Eng'rs Local No. 68 Welfare Fund v. Merck & Co.*, 192 *N.J.* 372, 389, 929 *A.*2d 1076 (2007); *Cox, supra,* 138 *N.J.* at 17, 647 *A.*2d 454. Under *N.J.S.A.* 56:8–2, "affirmative acts" are defined as "unlawful practices that include unconscionable commercial practices, fraud, deception, false promise, false pretense, and misrepresentation." *Thiedemann v. Mercedes–Benz USA,* 183 *N.J.* 234, 245, 872 *A.*2d 783 (2005). An intent to deceive is not a prerequisite to the imposition of liability for an affirmative act. *Ibid.; Gennari, supra,* 148 *N.J.* at 605, 691 *A.*2d 350; *accord Bosland v. Warnock Dodge, Inc.*, 197 *N.J.* 543, 556, 964 *A.*2d 741 (2009). "One who makes an affirmative misrepresentation is liable even in the absence of knowledge of the falsity of the misrepresentation, negligence, or the intent to deceive." *Gennari, supra,* 148 *N.J.* at 605, 691 *A.*2d 350.

In order to state a private claim under the CFA, a consumer must allege three elements: unlawful conduct; an ascertainable loss; and a causal relationship between the unlawful conduct and the ascertainable loss. *Bosland, supra,* 197 *N.J.* at 557, 964 *A.*2d 741; *Int'l Union of Operating Eng'rs, supra,* 192 *N.J.* at 389, 929 *A.*2d 1076; *N.J.S.A.* 56:8–19. In addition, before the CFA can be applied the consumer must show that the nature of the transaction was "consumer oriented," *Papergraphics, supra,* 389 *N.J.Super.* at 12–14, 910 *A.*2d 625, and involved the sale of "merchandise," *539 Absecon Blvd., L.L.C. v. Shan Enters.*, 406 *N.J.Super.* 242, 278, 967 *A.*2d 845 (App.Div.), *certif. denied,* 199 *N.J.* 541, 973 *A.*2d 945 (2009); and that the alleged violator was acting in "a professional, 'commercial' capacity," *Byrne v. Weichert Realtors,* 290 *N.J.Super.* 126, 135, 675 *A.*2d 235 (App.Div.), *certif.*

*denied,* 147 *N.J.* 259, 686 *A.*2d 761 (1996); *accord Strawn, supra,* 140 *N.J.* at 60, 657 *A.*2d 420.

### (B) Professional Sellers

In rejecting the landlords' claim that they are, in essence, unsophisticated neophytes, the Law Division concluded that leasing an apartment is a commercial transaction contemplated by the CFA, and further that no genuine issue of material fact existed concerning whether the landlords were in the business of renting apartments. Both of these conclusions are well supported by the record and case law.

It is well-established that the broad scope of the CFA encompasses transactions between residential tenants and their landlords. *49 Prospect St., supra,* 227 *N.J.Super.* at 464, 547 *A.*2d 1134. In such situations, the landlords are considered to be "sellers" and the tenants to be "consumers." *Id.* at 465, 547 *A.*2d 1134. While there may be some question as to whether the CFA applies to the isolated rental of an apartment in a two-family house, landlords who own a large apartment building, or several apartment buildings, "are obviously engaged in a commercial enterprise with the tenants as consumers." *Ibid.; see also 539 Absecon, supra,* 406 *N.J.Super.* at 274–75, 967 *A.*2d 845 (noting that CFA addressed public harm caused by unlawful practices by professional sellers seeking mass distribution of consumer goods).

Here, the record showed that Taddese earned a professional business degree from Penn State University and was employed as a director of finance for a large pharmaceutical company. He and Melaku owned at least three two-family homes in which the upper apartment was a rental unit. Their experience as landlords in Hoboken made them "keenly aware" of the City's rent control ordinance.

These facts strongly support the conclusion that Taddese and Melaku are sophisticated landlords in the business of renting residential apartments. The only evidence to the contrary is Melaku's unsupported statement that "[m]y husband ... and I

have virtually no experience as Hoboken landlords." This self-serving statement, standing alone, is insufficient to create a genuine issue of material fact concerning the landlords' professional capacity. In light of their education, experience, and particularized knowledge, the landlords' rental to the tenants of 81 Adams Street, Unit 2 was a consumer—oriented, commercial transaction that fell under the auspices of the CFA.

### (C) Unlawful Conduct

In rejecting the landlords' next argument that they did not intend to violate the CFA because they relied on the advice of counsel, the court found that the landlords committed an affirmative act of unlawful conduct by charging the tenants rent in excess of that allowed by the City's rent control ordinance. Although it noted that the landlords were aware of the rent control ordinance, it concluded that their knowledge or intent was irrelevant for purposes of the CFA. We agree once again.

As previously noted, a seller who makes an affirmative misrepresentation is liable under the CFA even in the absence of an intent to deceive. *Gennari, supra,* 148 *N.J.* at 605, 691 *A.2d* 350. In *Wozniak, supra,* 373 *N.J.Super.* at 456–57, 862 *A.2d* 539, we found that a landlord who charged rent in excess of the local rent control ordinance violated the CFA, regardless of the fact that the landlord claimed that he did not know that the ordinance was applicable to his property. We reasoned that because the landlord committed an affirmative act by raising the tenants' rent, the tenants did not need to prove that the landlord intended to commit an unconscionable commercial practice. *Id.* at 456, 862 *A.2d* 539. We rejected the landlord's argument that the CFA conflicted with the local rent control ordinance, observing that the CFA complimented the ordinance by providing a legal means of redress against a violator. *Id.* at 457–58, 862 *A.2d* 539.

In *Ryan v. Gina Marie, L.L.C.,* 420 *N.J.Super.* 215, 218–20, 20 *A.3d* 442 (App.Div.2011), a tenant in a multi-unit apartment building brought a private CFA action against her landlord for charging rent in excess of that allowed under Hoboken's rent control

ordinance. The procedural history of *Ryan* is similar to that of the instant matter, although its ultimate resolution differs due to issues concerning indemnification and joinder of previous building owners. *Id.* at 228–29, 20 *A.*3d 442. Relevant here is our approval of the grant of summary judgment on the tenant's CFA claim and award of treble damages, *id.* at 227, 20 *A.*3d 442 as well as our reliance on *Wozniak, supra,* 373 *N.J.Super.* at 456, 862 *A.*2d 539, as clearly holding "that a landlord's violation of a municipality's rent control ordinance subjects the landlord to liability under the consumer fraud statute." *Ryan, supra,* 420 *N.J.Super.* at 227, 20 *A.*3d 442.

Here, the landlords charged rent in excess of that allowed by the City's rent control ordinance. Just as in *Wozniak* and *Ryan,* the affirmative act of overcharging rent subjected the landlords to liability under the CFA.

The landlords claim that their attorney told them that the rent control ordinance did not apply to condominiums and that they relied on that advice in setting the rent. While good faith reliance on counsel's advice may be a relevant consideration when the unlawful practice claimed is a "knowing omission", where, as here, the CFA is violated by the occurrence of an "affirmative act", a plaintiff need not prove the landlord's knowledge of the illegality of the rent charged because intent to deceive or to commit an unconscionable commercial practice is not a prerequisite to the imposition of liability in such an instance. *Gennari, supra,* 148 *N.J.* at 605, 691 *A.*2d 350.

Even if a claim of mistaken reliance were cognizable under the CFA's strict liability standard, which it is not, the landlords' pleadings failed to raise a genuine issue of material fact concerning their knowledge that the rent was illegal. Their argument is based on Melaku's statement that because she and Taddese were concerned about the impact of rent control on their property, they "consulted with counsel ... who advised that rent control was not applicable because this was a condominium." On or about July 27, 2010, the landlords filed an "Amendment to *Rule*

4:5–1 Statement" with the court, stating that "[counsel] may be a party that a claim can be asserted against as a result [of] possible incidence of legal malpractice." They did not, however, produce any written documentation of the allegedly improper advice, nor did they join counsel in the lawsuit or seek his deposition. Thus, the only proof of their claim is Melaku's self-serving assertion.

Moreover, even if Melaku's statement were true, it would not relieve the landlords of liability under the CFA. Melaku claims that Foley told them that rent control did not apply to condominiums. When the landlords signed a lease with the tenants on June 27, 2007, however, Unit 2 was still an apartment. The condominium conversion did not occur until July 20, 2007. The landlords never informed the tenants of the conversion and never referred to Unit 2 as anything other than an apartment. Thus, the affirmative act of illegality occurred on June 27, 2007, when the landlords established a rent that they knew was in violation of the rent control ordinance for an apartment that they knew was subject to that ordinance. In fact, the landlords' failure to inform the tenants that the unit was about to be converted to a condominium which they believed would not be subject to rent control could be construed as a knowing omission that was itself violative of the CFA.

Accordingly, we conclude that the landlords violated the CFA as a matter of law. Even if their claim of mistaken reliance were relevant, however, the record fails to establish a genuine issue of material fact as to their liability under the CFA.

### (D) Ascertainable Loss

■ The landlords further argue that the tenants did not suffer an ascertainable loss because they failed to complete discussions over a reimbursement, but assuming such a loss, the court erred in fixing the amount which, they contend, should have been only the time loss of money calculated from when the tenants filed suit, and further reduced by the parking surcharge. We are satisfied that the court properly calculated the rent surcharge as $59,466.

■■■■■■ "[A] private plaintiff must have an ascertainable loss in order to bring an action under the [CFA]." *Weinberg v. Sprint Corp.*, 173 *N.J.* 233, 250, 801 *A.*2d 281 (2002). The term "ascertainable loss" means that a "plaintiff must suffer a definite, certain and measurable loss, rather than one that is merely theoretical." *Bosland, supra,* 197 *N.J.* at 558, 964 *A.*2d 741. "The certainty implicit in the concept of an ascertainable loss is that it is quantifiable or measurable." *Ibid.* (citation omitted) (internal quotation marks omitted).

In *Bosland,* the Court rejected the argument that a plaintiff asserting a private cause of action under the CFA must make a pre-suit refund demand before his or her loss can be deemed ascertainable. *Id.* at 558–59, 964 *A.*2d 741. In so doing, it noted that the plain language of the CFA does not impose the requirement that a plaintiff seek a remedy directly from the offending merchant. *Id.* at 557, 964 *A.*2d 741. The Court found that the loss claimed by the plaintiff—overpayment of an automobile registration fee—was an overcharge that could be readily quantified and hence was ascertainable within the meaning of the CFA. *Id.* at 559, 964 *A.*2d 741.

The landlords rely on *Feinberg v. Red Bank Volvo, Inc.,* 331 *N.J.Super.* 506, 752 *A.*2d 720 (App.Div.2000), to support their argument that demand for reimbursement prior to filing suit is a necessary element of proving ascertainable loss. In *Feinberg,* a consumer sued an automobile dealership for violation of the CFA based on the dealership's failure to include notice in advertisements of its "sign and drive" program that leases were only available to creditworthy customers. *Id.* at 508–09, 752 *A.*2d 720. The consumer prevailed at trial but we reversed, finding that although a CFA violation had occurred, the consumer failed to prove an ascertainable loss. *Ibid.* With regard to damages claimed for fees charged to the consumer's credit card, the court stated that "[t]here is absolutely no proof in this record that plaintiff demanded cancellation of this charge or reimbursement by defendant prior to filing suit. We consider that a necessary

element of proof in a matter such as this." *Id.* at 511, 752 *A.*2d 720.

We do not interpret *Feinberg* as requiring all CFA plaintiffs to seek reimbursement prior to filing suit. Indeed, we were careful to qualify our holding as pertaining to the particular circumstances presented, *ibid.,* namely that the consumer was a former lawyer who failed to disclose on his credit application that he had several outstanding judgments against him, *id.* at 509, 752 *A.*2d 720. Further, because the fees were put on his credit card only a day before the deal fell through, he could easily have contacted the credit card company to dispute the charge. These circumstances pertain more to the causal connection between the unlawful practice and the loss than to the ascertainable nature of the loss itself.

In *Bosland,* the Court specifically rejected a broad interpretation of *Feinberg. Bosland, supra,* 197 *N.J.* at 560, 964 *A.*2d 741. Noting the unique circumstances of *Feinberg,* the *Bosland* Court observed that the consumer's claim had been rejected "because the proofs were inadequate to demonstrate what part of the loss ... [was] caused by the dealer's allegedly unlawful practice." *Ibid.* The Court held that it was not unfair to refuse to find a CFA remedy for a plaintiff whose claim was premised on his own decision to engage in a fraudulent transaction. *Ibid.* It emphasized, however, that imposing a pre-suit demand requirement on all CFA plaintiffs would be contrary to the plain language of the statute and the public policy underlying it. *Id.* at 560–62, 964 *A.*2d 741.

Unlike the consumer in *Feinberg,* the tenants here engaged in no fraudulent conduct. Thus, under *Bosland,* they were not required to make a pre-suit demand for reimbursement. Even if such a requirement existed, however, the tenants certainly satisfied it.

The landlords' assertions that "the parties were actively working toward a resolution," "never was there a repudiation that the proper amount was to be repaid," and never was there any

demand by the tenants to conclude the matter, are not supported by the record. On September 21, 2009, the landlords were notified that the excess rent had to be refunded to the tenants forthwith. As late as February 2010, the landlords had yet to refund any money to the tenants nor did they pay funds into an escrow account pending their appeals to the Board. On February 4, 2010, the tenants signed a notarized release of their claims in exchange for less than a full refund of the overpayments, yet the landlords repudiated the agreement and dishonored the checks they had written. Two weeks later Taddese sent the tenants an email message threatening to sue them if they did not abandon their claims. It is clear from these facts that the landlords knew that they were legally obligated to refund the rent overcharges, that the tenants were seeking reimbursement, and that litigation was imminent. Not even *Feinberg* would have required the tenants to do any more prior to filing suit.

As to their next claim, the landlords cite no legal authority to support their argument that the proper measure of ascertainable loss should be the time loss of money from when the tenants filed suit. In both *Wozniak, supra,* 373 *N.J.Super.* at 455, 862 *A.*2d 539, and *Ryan, supra,* 420 *N.J.Super.* at 225, 20 *A.*3d 442 we calculated the damages recoverable by tenants under the CFA for rent overcharges to be the excess of the rent charged over the rent allowed, trebled, plus interest, fees and costs.

In *Romano v. Galaxy Toyota,* 399 *N.J.Super.* 470, 479, 945 *A.*2d 49 (App.Div.), *certif. denied,* 196 *N.J.* 344, 953 *A.*2d 763 (2008), we discussed the measure of a consumer's ascertainable loss in various consumer fraud situations. We noted that in a case involving an overcharge for services, ascertainable loss was measured as the actual extra costs charged, along with the increased sales tax, and any interest [4] accruing on the sum. *Id.* at 480, 945 *A.*2d 49 (citing

---

[4] The Law Division judge here did not award any interest on the excess rent charged by the landlords. The tenants do not appeal from the damage calculation, however.

*Delaney v. Garden State Auto Park*, 318 *N.J.Super.* 15, 21–22, 722 *A.*2d 967 (App.Div.), *certif. denied*, 160 *N.J.* 477, 734 *A.*2d 792 (1999)). We also noted that in common law fraud cases, an "out of pocket" approach was commonly applied to "provide[ ] recovery for the difference between the price paid and the actual value of the property acquired." *Id.* at 483, 945 *A.*2d 49. We observed that such an approach would make a party whole by reasonably compensating him or her for losses caused by consumer fraud. *Ibid.*

Applying an out of pocket approach here, the tenants' loss was the difference between the amount they actually paid in rent and the amount allowed by the rent control ordinance. That is exactly the calculation that the Law Division made.

██ Finally, the landlords argue that the court should have decreased the monthly excess by $400 to account for the rental of a parking spot. While it is true that the rent control ordinance excludes rent for "automobiles not used in connection with the housing space," the landlords failed to raise a genuine issue of fact concerning the parking charges.

The only evidence proffered by the landlords to support their claim that $400 of the rent was allocated to a parking space was their amended 2009 rent control registration statement. This statement was filed after the legal base rent determination revealed the rent overcharge and after the Board denied the landlords' appeal from that determination. It is supported by no other documentation. The tenants, on the other hand, produced an email message showing that the landlords initially sought to collect $125 per month for the parking space, which was to be in addition to the $4000 per month rent. In a subsequent email message, the landlords agreed that there would be no charge for the parking space. The landlords do not dispute the authenticity of these messages. Even viewed in the light most favorable to the landlords, this evidence cannot be construed as creating a genuine issue of material fact concerning the parking surcharge. *See Martin v. Rutgers Cas. Ins. Co.*, 346 *N.J.Super.* 320, 323, 787 *A.*2d

948 (App.Div.2002) (holding that self-serving assertions that lack support in the record are insufficient to create a question of material fact).

In sum, the tenants established that they suffered an ascertainable loss as the result of the landlords' rent overcharges. The court did not err in calculating that loss by taking the difference between the rent actually charged and the rent allowed under the ordinance.

### (E) Causation

The landlords also argue that whatever the loss, it was not the result of any act of consumer fraud or deviation from the ordinance, but rather "the failure to refund or credit forthwith." We disagree.

In order to recover under the CFA, a plaintiff must show that his or her ascertainable loss was caused by the seller's unlawful practice. *Roberts v. Cowgill,* 316 *N.J.Super.* 33, 41, 719 A.2d 668 (App.Div.1998) (citing *N.J.S.A.* 56:8–19); *see also, Bosland, supra,* 197 *N.J.* at 560, 964 A.2d 741 (noting that "a plaintiff who cannot prove the causal link between the asserted regulatory violation and his loss cannot find relief within the CFA"); *Cox, supra,* 138 *N.J.* at 23, 647 A.2d 454 (holding that causation provision of *N.J.S.A.* 56:8–19 requires plaintiffs to prove that unlawful consumer fraud caused loss). "Causation under the CFA is not the equivalent of reliance. To establish causation, a consumer merely needs to demonstrate that he or she suffered an ascertainable loss 'as a result of' the unlawful practice." *Lee v. Carter–Reed Co., L.L.C.,* 203 *N.J.* 496, 522, 4 A.3d 561 (2010) (citations omitted) (quoting *N.J.S.A.* 56:8–19). Courts have generally found causation to be established for CFA purposes when a plaintiff has demonstrated a direct correlation between the unlawful practice and the loss; they have rejected proofs of causation that were speculative or attenuated. *See Dabush v. Mercedes–Benz USA,* 378 *N.J.Super.* 105, 123–24, 874 A.2d 1110 (App.Div.) (discussing causation under the CFA), *certif. denied,* 185 *N.J.* 265, 883 A.2d 1062 (2005); *N.J. Citizen Action v. Schering–Plough*

*Corp.,* 367 *N.J.Super.* 8, 9–10, 842 *A.*2d 174 (App.Div.) (same), *certif. denied,* 178 *N.J.* 249, 837 *A.*2d 1092 (2003).

Here, the tenants' loss is neither speculative nor attenuated. The landlords' overcharge caused the tenants to lose money every month that they paid the illegal rent. Such loss was direct and personal to each tenant.

The landlords cite no legal authority for their assertion that the tenants' losses were caused solely by the lack of a prompt refund. Nevertheless, it must be noted that no prompt refund occurred. The landlords' claim that the City gave them erroneous advice concerning the refund is unsupported by the record. To the contrary, the evidence shows that the Board directed the landlords to refund the overcharge forthwith and then denied their appeal of that determination. The Board also denied the landlords' efforts to apply a hardship rent increase retroactively. Thus, the landlords had no basis for refusing to proffer a full refund.

In sum, like their other contentions with regard to the CFA, the landlords' arguments concerning causation lack a basis in either the law or the facts. The court's grant of summary judgment in favor of the tenants on their CFA claim and its calculation of treble damages were entirely proper.

## II.

The landlords argue that the City's rent control ordinance is unconstitutionally vague on its face and as applied to their property. They complain that the ordinance's definition of "dwelling" does not encompass a condominium, which "is neither a building nor structure ... [but] is part of a vertical integrated legal fiction." The court below rejected the vagueness challenge outright, and so do we.

A municipal ordinance carries a presumption of validity and the party seeking to overturn it bears a heavy burden. *Hutton Park Gardens v. Town Council of W. Orange,* 68 *N.J.* 543, 564, 350 *A.*2d 1 (1975). The presumption of validity is particularly

daunting when the enactment seeks to protect the public health, safety, or welfare. *State v. Lenihan,* 427 *N.J.Super.* 499, 512, 49 *A.*3d 415 (App.Div.2012) (citing *In re C.V.S. Pharmacy Wayne,* 116 *N.J.* 490, 497, 561 *A.*2d 1160 (1989), *cert. denied,* 493 *U.S.* 1045, 110 *S.Ct.* 841, 107 *L.Ed.*2d 836 (1990)), *certif. granted,* 213 *N.J.* 386, 63 *A.*3d 226 (2013).

 "Vagueness is essentially a procedural due process concept grounded in notions of fair play." *State v. Lee,* 96 *N.J.* 156, 165, 475 *A.*2d 31 (1984) (quotation omitted). Laws that do not provide adequate notice of their scope and sufficient guidance for their application are constitutionally banned. *In re Commitment of N.N.,* 146 *N.J.* 112, 126, 679 *A.*2d 1174 (1996); *Town Tobacconist v. Kimmelman,* 94 *N.J.* 85, 118, 462 *A.*2d 573 (1983). "A law is void if it is so vague that persons of common intelligence must necessarily guess at its meaning and differ as to its application." *State of N.J., Twp. of Pennsauken v. Schad,* 160 *N.J.* 156, 181, 733 *A.*2d 1159 (1999) (internal quotation marks omitted); *accord N.N., supra,* 146 *N.J.* at 126, 679 *A.*2d 1174. Nevertheless, "an ordinance may be written in 'broad terms, provided it is controlled by a sufficient basic norm or standard. It need not be minutely detailed to cover every possible situation.'" *Schad, supra,* 160 *N.J.* at 182, 733 *A.*2d 1159 (quoting *Karins v. City of Atlantic City,* 152 *N.J.* 532, 542, 706 *A.*2d 706 (1998)).

 A statute or ordinance can be challenged as either "facially" vague or vague "as applied." *State v. Rogers,* 308 *N.J.Super.* 59, 65, 705 *A.*2d 397 (App.Div.), *certif. denied,* 156 *N.J.* 385, 718 *A.*2d 1214 (1998). "[A] law that is challenged for facial vagueness is one that is assertedly impermissibly vague in all its applications." *State v. Cameron,* 100 *N.J.* 586, 594, 498 *A.*2d 1217 (1985); *accord Town Tobacconist, supra,* 94 *N.J.* at 119, 462 *A.*2d 573. An "as applied" challenge will lie if the law does not, with sufficient clarity, prohibit the conduct against which it is sought to be enforced. *State v. Afanador,* 134 *N.J.* 162, 175, 631 *A.*2d 946 (1993); *see Cameron, supra,* 100 *N.J.* at 594, 498 *A.*2d 1217 (holding that statute challenged as applied "need not be proven

vague in all conceivable contexts, but must be shown to be unclear in the context of the particular case").

In determining whether an ordinance is vague, "a common sense approach is appropriate in construing the enactment." *Chez Sez VIII, Inc. v. Poritz*, 297 *N.J.Super.* 331, 351, 688 *A.*2d 119 (App.Div.), *certif. denied*, 149 *N.J.* 409, 694 *A.*2d 194, *cert. denied*, 522 *U.S.* 932, 118 *S.Ct.* 337, 139 *L.Ed.*2d 262 (1997). The language of the ordinance "should be given its ordinary meaning absent specific intent to the contrary." *Mortimer v. Bd. of Review*, 99 *N.J.* 393, 398, 493 *A.*2d 1 (1985). When examining statutory language for vagueness, the test is whether a person of average intelligence comprehends the meaning of the words. *Afanador, supra*, 134 *N.J.* at 171, 631 *A.*2d 946.

"[W]hen a statute is challenged as either facially vague or vague as applied, different levels of 'definitional clarity' are required depending on the type of statute under scrutiny." *Commc'ns Workers of Am. v. State of N.J., Dep't of Treasury*, 421 *N.J.Super.* 75, 104, 22 *A.*3d 170 (Law Div.2011) (quoting *Cameron, supra*, 100 *N.J.* at 592, 498 *A.*2d 1217). For example, penal laws and those implicating First Amendment liberties are subjected to sharper scrutiny and given more exacting assessment than "those enactments with civil penalties, due to the differences in likelihood and consequences of any misunderstanding." *Ibid.; accord Cameron, supra*, 100 *N.J.* at 592, 498 *A.*2d 1217. An economic regulation in particular " 'is subject to a less strict vagueness test because its subject matter is often more narrow, and because businesses, which face economic demands to plan behavior carefully, can be expected to consult relevant legislation in advance of action.' " *Cameron, supra*, 100 *N.J.* at 592, 498 *A.*2d 1217 (quoting *Village of Hoffman Estates v. Flipside, Hoffman Estates, Inc.*, 455 *U.S.* 489, 498, 102 *S.Ct.* 1186, 1193, 71 *L.Ed.*2d 362, 371–72, *reh'g denied*, 456 *U.S.* 950, 102 *S.Ct.* 2023, 72 *L.Ed.*2d 476 (1982)); *accord Town Tobacconist, supra*, 94 *N.J.* at 119 n. 16, 462 *A.*2d 573.

In this matter, the City's rent control ordinance must be afforded a strong presumption of validity because its purpose is to promote the public welfare. *See* City of Hoboken, N.J., Municipal Rent Control Ordinance § 155–1 (2012) (stating that policy of governing body is to interfere in landlord tenant relations "only when necessary to protect the public interest"). The landlords' argument is that the ordinance's lack of specificity in its definition of "dwelling" makes its application to condominiums unclear. Even if the landlords' assertion were true, this would not render the ordinance facially vague.

In order to be facially vague, the ordinance would need to be vague to all persons in all conceivable contexts. *Cameron, supra,* 100 *N.J.* at 594, 498 *A.*2d 1217. It is not. For example, the owner of an apartment who rents the housing space therein to a tenant would know that the premises is subject to rent control because the ordinance clearly states that it establishes rents for housing spaces in dwellings and defines a dwelling as a building or structure rented to a tenant. City of Hoboken, N.J., Municipal Rent Control Ordinance, *supra,* §§ 155–1, –3. Since the ordinance is clear in this context, it is not facially vague.

The only plausible argument, therefore, is that the ordinance is impermissibly vague as applied to the landlords specifically. This argument, too, fails for several reasons. In the first place, the rent control ordinance is an economic regulation and, as such, is subject to a lesser level of scrutiny. *Commc'ns Workers of Am., supra,* 421 *N.J.Super.* at 104, 22 *A.*3d 170. Moreover, the landlords had the opportunity and the obligation to seek a clarification from the City as to whether the ordinance applied to condominium units. *Cameron, supra,* 100 *N.J.* at 592, 498 *A.*2d 1217; *Town Tobacconist, supra,* 94 *N.J.* at 119 n. 16, 462 *A.*2d 573. They failed to do so.

Most notably, however, giving the language of the ordinance its ordinary meaning, an average person would be able to understand its application. The ordinance establishes rent for "housing space in dwellings," *id.* at § 155–3, and defines a dwelling as a "building

or structure," *id.* at § 155–1. A condominium *unit* is a housing space within a condominium *building*. It is therefore covered by the ordinance. The landlord's proposed definition of condominium as "a vertical integrated legal fiction" pertains to the nature of condominium ownership, not the actual living space occupied by a tenant, and tenants do not reside in a legal fiction.

Lastly, the ordinance is not vague as applied to the landlords because at the time Unit 2 was rented, it was still an apartment. It thus fell squarely under the definitional language of the ordinance. City of Hoboken, N.J., Municipal Rent Control Ordinance, *supra*, § 155–1. Thus, regardless of the ordinance's clarity with regard to condominiums, as applied to these landlords, who owned the apartment at the time of the lease, the ordinance was not vague. This is the reasoning applied by the court below and it is well supported by the record and the law.

### III.

The landlords argue that the Board erred by refusing to hear their appeal of the base rent calculation set forth in the Board's letter of April 18, 2005, and the court erred by upholding that decision. They contend that because the apartment was still under a HAP contract in April 2005, the application of rent control was preempted and the letter was a nullity and otherwise ultra vires. They assert that their appeal was not untimely because an ultra vires act of a municipal body is utterly void and subject to collateral attack at any time.

The Board responds that the landlords' appeal of the April 18, 2005 legal rent calculation was grossly out of time; that the landlords were aware no later than July 11, 2005, that rent control applied to Caparra homes; and that, in any event, the landlords were required to make a diligent search to uncover the April 18, 2005 letter issued for 81 Adams Street. The Board maintains that the letter was not a nullity and that the base legal rent set forth therein would not have changed between the date it was issued and the date the HAP contract expired.

The Law Division found that the Board properly adhered to its ordinance, which provides a grievant twenty days to appeal a decision of a rent control officer. It concluded that while the Board had the discretion to review the 2005 letter, it was not compelled to do so.

The HAP contract on 81 Adams Street was originally set to expire on March 31, 2005, but it was renewed for a five-month term ending on August 31, 2005. Letters documenting the renewal have October and November 2005 dates, so it appears that the City was not immediately aware of the contract extension. On April 18, 2005, the Board's Division Chief sent a letter to Edith Vega, then the owner of 81 Adams Street, stating that the HAP agreement on her Caparra home had expired on April 1, 2005, and the property was now subject to rent control. The legal base rent for her rental unit was calculated to be $1855 for a new tenant.

Also on April 18, 2005, the Board's Division Chief sent a letter to Pedro Rowan, the owner of 90 Grand Street, likewise informing him that the HAP agreement on his Caparra home had expired and calculating a legal base rent for his rental unit at $1855. The landlords purchased 90 Grand Street from Rowan on May 11, 2005. They immediately raised the rent of their existing tenant, who sought relief from the Board. On July 11, 2005, the Division Chief wrote to Melaku stating that the proposed rent increase was excessive. In so doing, the Division Chief specifically referred to the April 18, 2005 letter.

The landlords purchased 81 Adams Street on October 16, 2006. On November 11, 2009, they submitted documents to the Board that adopted the base rent calculated from the 2005 figure. They did not challenge the April 18, 2005 legal base rent calculation until February 9, 2010.

City of Hoboken, N.J., Municipal Rent Control Ordinance, *supra*, § 155–23 provides:

All determinations made by the Rent Regulation Officer are appealable to the Board. The burden of said appeal is on the appellant who must demonstrate that the Officer's determination was in error or arbitrary, capricious and unreasonable.

Said appeal must be filed with the Board within twenty (20) days of the Rent Regulation Officer's decision.

▆ A municipal rent control board is generally expected to follow the provisions of its own ordinance. *Schulmann Realty Group v. Hazlet Twp. Rent Control Bd.*, 290 *N.J.Super.* 176, 183, 675 *A.*2d 645 (App.Div.1996); *accord Mayes v. Jackson Twp. Rent Leveling Bd.*, 103 *N.J.* 362, 376, 511 *A.*2d 589 (1986), *cert. denied,* 479 *U.S.* 1090, 107 *S.Ct.* 1300, 94 *L.Ed.*2d 155 (1987). This is so because "[n]o administrative agency has inherent power, and none may arrogate to itself the authority to accomplish ends not envisaged by the legislative grant or to employ means not fairly within the powers that have been bestowed." *Knight v. Hoboken Rent Leveling & Stabilization Bd.*, 332 *N.J.Super.* 547, 551, 753 *A.*2d 1231 (App.Div.2000).

Here, the ordinance required any appeal of the April 18, 2005 determination to be filed within twenty days of its issuance. The landlords learned of the existence of the April 18, 2005 determination regarding Caparra homes when they received the Board's letter on or about July 11, 2005. They did not challenge the determination at that time, nor did they make any specific inquiry as to its applicability when they purchased 81 Adams Street on October 16, 2006. Moreover, the landlords relied on the 2005 determination in their 2009 hardship application, yet they still did not appeal it. Their argument that they did not formulate a legal basis for an appeal until February 2010 is unavailing. *Cf. Caravaggio v. D'Agostini,* 166 *N.J.* 237, 246, 765 *A.*2d 182 (2001) (holding that statute of limitations is not tolled because plaintiff lacks knowledge of specific basis for legal liability or provable cause of action). Because the landlords' appeal was grossly out of time, the Board's refusal to hear it was not arbitrary, capricious, or unreasonable.

▆ The landlords assert that the time bar is irrelevant because the 2005 determination was an ultra vires act that was void ab initio. They are mistaken.

An action that is void ab initio is null from the beginning. *Gobe Media Grp., LLC v. Cisneros,* 403 *N.J.Super.* 574, 577 n. 1, 959 *A.*2d 892 (App.Div.2008). An action that is merely voidable, on the other hand, is valid until annulled and capable of being affirmed or rejected by one of the parties. *Ibid.* In the context of governmental actions, it has long been recognized that

[t]here is a distinction between an act utterly beyond the jurisdiction of a municipal corporation and the irregular exercise of a basic power under the legislative grant in matters not in themselves jurisdictional. The former are *ultra vires* in the primary sense and void; the latter, *ultra vires* only in a secondary sense which does not preclude ratification....

[*Summer Cottagers' Ass'n of Cape May v. City of Cape May,* 19 *N.J.* 493, 117 *A.*2d 585 (1955).]

*Accord Middletown Twp. Policemen's Benevolent Ass'n v. Twp. of Middletown,* 162 *N.J.* 361, 368, 744 *A.*2d 649 (2000).

Here, the Board's authority to apply the rent control ordinance to Caparra homes was preempted by the HAP contracts, but only during the term of those contracts. City of Hoboken, N.J., Municipal Rent Control Ordinance, *supra,* § 155-2.1. Once the contracts terminated, Caparra homes became subject to the ordinance. *Ibid.*

The ordinance confers authority upon the rent regulation officer to determine the legal base rent for a rental unit. City of Hoboken, N.J., Municipal Rent Control Ordinance, *supra,* § 155-3. Thus, the issuance of the April 18, 2005 determination letter was not beyond the jurisdiction of the Board and not ultra vires in the primary sense. At best, federal preemption may have rendered it an irregular exercise of the Board's authority and hence voidable. When the HAP contract expired, however, the ordinance, by its own provision,[5] became applicable and the determina-

---

[5] The ordinance states: "If a contract between a landlord and a governmental agency duly provides for that governmental agency to regulate the amount of rent received by that landlord, and if the authority of that governmental agency supersedes the authority of the City of Hoboken to regulate such rents, then the application of this chapter shall be pre-empted *during the period of governmental agency regulation specified in the contract.* Until such a contract begins, and

tion was ratified. Even if some affirmative act of ratification were required of the Board, it certainly took such action by applying the 2005 determination in arriving at its legal base rent determination on September 21, 2009.

In sum, the landlords' appeal of the 2005 legal base rent determination was untimely. That determination was not void ab initio, but merely voidable during the five-month extension of the HAP contract. By the time the landlords sought to appeal the determination, it had long since been ratified. Accordingly, we conclude that the Board did not abuse its discretion in refusing to hear the landlords' appeal.

## IV.

The landlords next argue that the tenants lacked standing to challenge the Board's grant of a hardship rent increase. They further argue that the court erred in vacating the Board's decision and remanding their application for reconsideration. Despite this contention, they nevertheless assert that the Board's decision was in error and should have been remanded because it did not apply the rent increase retroactively.

The tenants respond that the Board erred by failing to take the second mortgage into account when evaluating the hardship application. They further argue that even if a rent increase had been appropriate, it should not have been applied retroactively absent extraordinary circumstances not present here.

The Board responds that it acted well within its discretion in not applying the rent increase retroactively. It maintains that the landlords should not be afforded an equitable remedy when they knowingly contravened the mandates of the rent control ordinance.

immediately after the contract terminates, this chapter shall continue to regulate such rents...." City of Hoboken, N.J., Municipal Rent Control Ordinance, *supra,* § 155–2.1 (emphasis added).

In remanding the landlords' hardship application for reconsideration, the court concluded that the Board acted unreasonably by failing to consider the effect that the second mortgage had on the landlords' expected return on investment. It rejected the landlords' argument as to standing, finding that there was a nexus between the tenants and the property.[6]

"In general terms, standing requires that a litigant have a sufficient stake in the matter and real adversariness, with a substantial potential for real harm flowing from the outcome of the case." Pressler & Verniero, *Current N.J. Court Rules*, comment 2.1 on *R.* 4:26–1 (2013) (citing *In re N.J. Bd. of Pub. Utils.*, 200 *N.J.Super.* 544, 556, 491 *A.*2d 1295 (App.Div.1985)). In order to have standing to challenge a regulatory action, the claimant must allege that the challenged action has caused him or her injury in fact and that the interest sought to be protected is arguably within the zone of interests to be protected by the regulation in question. *Matlack v. Burlington Cnty. Bd. of Chosen Freeholders*, 191 *N.J.Super.* 236, 248, 466 *A.*2d 83 (Law Div.1982), *aff'd o.b.*, 194 *N.J.Super.* 359, 476 *A.*2d 1262 (App.Div.), *certif. denied*, 99 *N.J.* 191, 491 *A.*2d 693 (1984); *Trombetta v. Mayor & Comm'rs of Atl. City*, 181 *N.J.Super.* 203, 222, 436 *A.*2d 1349 (Law Div.1981), *aff'd o.b.*, 187 *N.J.Super.* 351, 454 *A.*2d 900 (App.Div.1982).

The landlords filed their hardship application on December 22, 2009, and it was granted on January 29, 2010. The tenants remained in Unit 2 at least through February 2010. Thus, the requirements for standing were satisfied because the Board's decision was based on a regulation designed to protect tenants' interests, the tenants' position was adverse to that of the landlords', and the tenants were directly affected by the grant of a hardship increase. Indeed, the tenants' interests were amplified

---

6 In January 2011, the landlords' counsel informed the court that the Board had acted on the remand and that the landlords intended to appeal its decision. The court responded that any such appeal would be a separate proceeding and not included in this case.

by the fact that the landlords sought to have the increase applied retroactively.

As for the merits of the application, the ordinance provides that if "a landlord cannot meet his operating expenses or does not make a fair return on his investment, he may appeal to the Rent Leveling and Stabilization Board for a hardship rental increase." City of Hoboken, N.J., Municipal Rent Control Ordinance, *supra,* § 155–14. In determining whether an increase is warranted the Board considers several factors including the landlords' equity in the property, which is defined as "[t]he actual cash contribution of the purchaser at the time of closing of title and any principal payments to outstanding mortgages." *Id.* at § 155–1.

Although the landlords paid off their original mortgage on 81 Adams Street in August 2007, they took out a new mortgage on Unit 2 in April 2008. The Board did not consider the new mortgage in evaluating the hardship application, however, but rather assumed that the paid-off mortgage gave the landlords 100% equity in the property. The resulting fair return calculation was thus significantly higher than it would have been if the new mortgage had been taken into account.

The landlords maintain that the Board's determination was correct because title closed just once—when the property was originally purchased—and hence the ordinance only required the Board to consider the first mortgage when calculating equity. The tenants, on the other hand, argue that title closes every time a property is refinanced and for that reason the second mortgage should have been factored into the equity calculation. The court agreed with the tenants and so do we. Because the Board did not consider the second mortgage, a remand was appropriate. If the Board disagreed with the court's interpretation of the ordinance, it would have the opportunity to make its reasoning clear upon reconsideration.

The remaining issue of the retroactivity of the rent increase is therefore moot because the relief that the landlords requested—a

reversal and a remand—was granted. *See Betancourt v. Trinitas Hosp.*, 415 *N.J.Super.* 301, 311, 1 *A.*3d 823 (App.Div.2010) (noting that mootness is a threshold justiciability determination rooted in the notion that judicial power should be exercised only when party is immediately threatened with harm). On remand, the Board might have decided that no hardship increase was warranted, thus nullifying the retroactivity issue, or the Board might have awarded an increase retroactive to the time the application was filed, again blunting the landlords' argument.

Although we need not decide the issue, we simply note that while rent control boards may grant retroactive increases,[7] such instances have involved situations where hardship increases were delayed through no fault of the applicants. In *Orange Taxpayers Council v. Orange*, 83 *N.J.* 246, 259, 416 *A.*2d 353 (1980), the Court held that a provision allowing hardship rent increases to be made retroactive to the date an apartment was certified to be in compliance with the property codes adequately compensated property owners for "regulatory lag." In *Silverman v. Rent Leveling Bd. of Cliffside Park*, 277 *N.J.Super.* 524, 533, 649 *A.*2d 1342 (App.Div.1994), *certif. denied*, 139 *N.J.* 443, 655 *A.*2d 445 (1995), we stated in dicta that a hardship rent increase should have been made retroactive to the date of the application in light of the municipality's undue delay in processing it.

We perceive no such extraordinary circumstances here. The Board did not delay the landlords' hardship application; in fact, it approved it within a month of its filing. Moreover, the landlords can point to no reason for not filing their application sooner. As the Board notes, retroactive application of a hardship increase is an equitable remedy that should not be afforded to a party who is a wrongdoer or who otherwise has unclean hands.

---

[7] The relevant ordinance states that "[i]t shall be within the discretion of the Board to fix the effective date of any approved rental increase to be at any reasonable time as determined by the Board." City of Hoboken, N.J., Municipal Rent Control Ordinance, *supra*, at § 155–14.

*Borough of Princeton v. Bd. of Chosen Freeholders of Mercer Cnty.*, 169 *N.J.* 135, 158, 777 *A.*2d 19 (2001). Here the landlords charged an illegal rent and did not seek relief until their tenants attempted to vindicate their rights.

## V.

The landlords raised claims for violation of their civil rights under 42 *U.S.C.A.* § 1983, impairment of contract, and regulatory taking. The court initially ruled that all of these claims were time barred, but later revised its ruling to dismiss the § 1983 claims on statute of limitation grounds and the remaining claims as meritless. We concur in these results.

### (A) 42 *U.S.C.* § 1983 Claims

The landlords argue that their § 1983 claims did not accrue until 2009 and 2010 when, in response to the tenants' request for an appraisal, the Board used the 2005 rent calculation to determine a legal base rent and refused to permit an appeal of that action. They assert that in any event the statute of limitations should be equitably tolled because they did not possess information concerning the questionable nature of the 2005 base rent determination until 2010.

The tenants and the Board respond that the § 1983 claims are time-barred because the landlords filed their complaint more than two years after purchasing the Adams Street property, and that equitable tolling should not be applied because it would reward the landlords for unconscionable conduct.

In dismissing the § 1983 claims as untimely, the court found that the landlords' action began to accrue on April 18, 2005, and that they knew as early as July 11, 2005, that they were subject to the rent control ordinance. The court further reasoned that the landlords should not be allowed to benefit from renting their property at an excess rate and waiting for the tenants to seek an appraisal before asserting a § 1983 claim.

■ Every § 1983 claim is subject to the statute of limitations applicable to personal injury claims in the state where the cause of action arose. *Wilson v. Garcia*, 471 *U.S.* 261, 266–67, 105 *S.Ct.* 1938, 1942, 85 *L.Ed.*2d 254, 260 (1985). In New Jersey, that statute is *N.J.S.A.* 2A:14–2, which requires that a suit for personal injury be commenced within two years from the accrual of the cause of action. *3085 Kennedy Realty Co. v. Tax Assessor of Jersey City*, 287 *N.J.Super.* 318, 323, 671 *A.*2d 137 (App.Div.1996) (citing *Cito v. Bridgewater Twp. Police Dep't*, 892 *F.*2d 23, 25 (3d Cir.1989)).

■ "Federal law determines when a § 1983 cause of action accrues." *Ibid.* (citing *Hondo, Inc. v. Sterling*, 21 *F.*3d 775, 778 (7th Cir.1994)). The general rule is that a § 1983 cause of action begins to accrue when the plaintiff knows, or has reason to know, of the injury on which the action is based. *Montgomery v. DeSimone*, 159 *F.*3d 120, 126 (3d Cir.1998); *accord Kelly v. City of Chicago*, 4 *F.*3d 509, 511 (7th Cir.1993).

Here, the court's finding that the action began to accrue on April 18, 2005, is unsupported by the record. There is no evidence that the landlords knew of the legal-base-rent-calculation letters at that time because they did not yet own a Caparra home. A July 11, 2005 letter from the Board informed the landlords of the legal base rent calculation and how it affected them. That is the day on which their cause of action began to accrue. In order to comply with the two-year statute of limitation on § 1983 actions, the landlords' complaint should have been filed no later than July 11, 2007. By the time the complaint was filed in March 2010, it was nearly three years out of time.

■ Nor did the "discovery rule" operate to toll the statute of limitations in this matter. "The discovery rule is essentially a rule of equity." *Lopez v. Swyer*, 62 *N.J.* 267, 273, 300 *A.*2d 563 (1973). It was developed as a means of mitigating the harsh results which flow from a rigid adherence to a strict rule of law. *Id.* at 273–74, 300 *A.*2d 563. The issue that must be determined by the trial judge is whether the party requesting relief is

equitably entitled to the benefit of the discovery rule. *Id.* at 275, 300 *A.*2d 563. The requesting party bears the burden of proof and persuasion in that regard. *Id.* at 276, 300 *A.*2d 563; *accord Hardwicke v. Am. Boychoir Sch.,* 188 *N.J.* 69, 114, 902 *A.*2d 900 (2006).

> Equitable tolling is traditionally reserved for limited occasions. These include: "(1) [if] the defendant has actively misled the plaintiff, (2) if the plaintiff has 'in some extraordinary way' been prevented from asserting his rights, or (3) if the plaintiff has timely asserted his rights mistakenly in the wrong forum," with the caveat that any restrictions on tolling "must be scrupulously observed."
>
> [*F.H.U. v. A.C.U.,* 427 *N.J.Super.* 354, 379, 48 *A.*3d 1130 (App.Div.) (alteration in original) (quoting *Kocian v. Getty Ref. & Mktg. Co.,* 707 *F.*2d 748, 753 (3rd Cir.), *cert. denied,* 464 *U.S.* 852, 104 *S.Ct.* 164, 78 *L.Ed.*2d 150 (1983)), *certif. denied,* 212 *N.J.* 198, 52 *A.*3d 176 (2012).]

"In general, ignorance of the existence of a cause of action will not prevent the running of a period of limitations except when there has been concealment." *Reilly v. Brice,* 109 *N.J.* 555, 559, 538 *A.*2d 362 (1988).

Here, the landlords have offered no evidence of concealment or misdirection on the part of the tenants. They were alerted to the existence of the April 18, 2005 letter by the Board on July 11, 2005, and the facts and figures surrounding the HAP contracts were public information. The landlords have also failed to point to any extraordinary circumstances that prevented them from asserting their rights sooner. Thus, none of the equitable considerations that would warrant tolling are present. The only circumstance that the landlords cite, their ignorance of a cause of action, is insufficient to prevent the running of the limitation period.

Balanced against the lack of equity in the landlords' favor, are the equitable considerations that weigh against them. The fact that the landlords charged rent in excess of that allowed by the ordinance, failed to refund the overcharges when so directed by the Board, refused to negotiate with the tenants in good faith, and made false and misleading statements in their certifications to the court all militate against granting them equitable relief.

In sum, the court's dismissal of the § 1983 claims is well supported by the record.

(B) Impairment of Contract; Regulatory Taking

The landlords claim that application of the rent control ordinance to their property impaired their right of contract in violation of the United States Constitution, *U.S. Const.* art. I, § 10, and the New Jersey Constitution, *N.J. Const.* art. IV, § 7, ¶ 3. Other than that bare assertion, they set forth no argument to explain how the ordinance impaired their right of contract. They likewise failed to address their impairment claim before the court below. That claim therefore should not be considered on appeal. *See Nieder v. Royal Indem. Ins. Co.,* 62 *N.J.* 229, 234, 300 *A.*2d 142 (1973) (holding that appellate courts should decline to consider issues not properly presented to trial court when opportunity for such presentation is available); *Nextel of N.Y., Inc. v. Englewood Cliffs Bd. of Adj.,* 361 *N.J.Super.* 22, 45, 824 *A.*2d 198 (App.Div. 2003) (holding that court will not consider issue that is based on mere conclusory statements); *State v. Hild,* 148 *N.J.Super.* 294, 296, 372 *A.*2d 642 (App.Div.1977) (holding that parties have a duty to justify their positions by specific reference to legal authority).

The landlords' claim that the ordinance constitutes a regulatory taking is better articulated. They maintain that the analysis should not be whether they retain a reasonable rate of return on their investment, but whether their original investment expectations were met. They cite four separate actions as constituting regulatory takings: 1) a 2000 amendment that made the ordinance applicable to properties enrolled in subsidy programs; 2) the issuance of the April 18, 2005, base rent calculation; 3) the lack of annual adjustments to the 2005 base rent calculation; 4) the rejection of the landlords' 2010 appeal of the base rent calculation.

The court initially dismissed the landlords' takings claims as time barred. On reconsideration, it reinstated them, reasoning that they are distinct from the 42 *U.S.C.A.* § 1983 claims and governed by a six-year statute of limitations. Nevertheless, it subsequently dismissed the takings claims as meritless. Relying on *Silverman, supra,* 277 *N.J.Super.* 524, 649 *A.*2d 1342, the court concluded that a rent control ordinance does not impose a regula-

tory taking on a landlord whose unit falls within its scope. The court noted that the landlords were still afforded the opportunity to enjoy a reasonable return on their investment in the Adams Street property.

In positing their argument, the landlords proffer calculations of what the 2005 legal base rent should have been. The tenants and the Board dispute these calculations, arguing that they are based on a misunderstanding of the HAP contracts. If the resolution of this issue depended on the correctness of the 2005 legal base rent calculation, then a remand would be necessary because the Board—the entity with expertise in this area—never adjudicated the merits of that calculation. Evaluating the 2005 calculation, however, is not necessary to the determination of whether a regulatory taking occurred.

The Takings Clause of the Fifth Amendment to the United States Constitution, made applicable to the states through the Fourteenth Amendment, provides that property shall not be taken for public use, without just compensation. *Lingle v. Chevron, U.S.A., Inc.,* 544 *U.S.* 528, 536, 125 *S.Ct.* 2074, 2080, 161 *L.Ed.*2d 876, 886 (2005). The New Jersey Constitution, article I, paragraph 20, and article IV, section 6, paragraph 3, likewise provide protections against governmental takings of private property without just compensation. *Klumpp v. Borough of Avalon,* 202 *N.J.* 390, 404–05, 997 *A.*2d 967 (2010). The State constitutional protections have been found to be coextensive with the Federal Takings Clause. *Id.* at 405, 997 *A.*2d 967; *OFP, L.L.C. v. State,* 395 *N.J.Super.* 571, 581, 930 *A.*2d 442 (App.Div.2007), *aff'd o.b.,* 197 *N.J.* 418, 963 *A.*2d 810 (2008).

When the state regulates property to provide for the general welfare of its citizens, there are inevitably consequences that affect the rights of property owners. *Mansoldo v. State,* 187 *N.J.* 50, 53, 898 *A.*2d 1018 (2006). "[W]hile property may be regulated to a certain extent, if regulation goes too far *it will be recognized as a taking.*" *Pennsylvania Coal Co. v. Mahon,* 260 *U.S.* 393, 415, 43 *S.Ct.* 158, 160, 67 *L.Ed.* 322, 326 (1922). The

problem, however, has always been in determining at what point the regulation of property becomes so burdensome as to constitute a taking. *Washington Mkt. Enters., Inc. v. City of Trenton,* 68 *N.J.* 107, 116, 343 *A.*2d 408 (1975).

When a regulation does not effect a physical invasion of the property and does not deprive the owner of all economically beneficial use, courts look to a number of factors in evaluating whether a taking has occurred. *Lingle, supra,* 544 *U.S.* at 538, 125 *S.Ct.* at 2081, 161 *L.Ed.*2d at 888. Primary among those factors is "[t]he economic impact of the regulation on the claimant and, particularly, the extent to which the regulation has interfered with distinct investment-backed expectations[.]" *Penn Cent. Transp. Co. v. New York City,* 438 *U.S.* 104, 124, 98 *S.Ct.* 2646, 2659, 57 *L.Ed.*2d 631, 648, *reh'g denied,* 439 *U.S.* 883, 99 *S.Ct.* 226, 58 *L.Ed.*2d 198 (1978). Also relevant is the character of the government action. *Ibid.* "[I]n instances in which a state tribunal reasonably concluded that 'the health, safety, morals, or general welfare' would be promoted by prohibiting particular contemplated uses of land, [the U.S. Supreme Court] has upheld land-use regulations that destroyed or adversely affected recognized real property interests." *Id.* at 125, 98 *S.Ct.* at 2659, 57 *L.Ed.*2d at 649.

With specific regard to rent control ordinances, the United States Supreme Court has consistently held that "States have broad power to regulate housing conditions in general and the landlord-tenant relationship in particular without paying compensation for all economic injuries that such regulation entails." *Loretto v. Teleprompter Manhattan CATV Corp.,* 458 *U.S.* 419, 440, 102 *S.Ct.* 3164, 3178, 73 *L.Ed.*2d 868, 885 (1982); *see also Fed. Commc'n Comm'n v. Fla. Power Corp.,* 480 *U.S.* 245, 252, 107 *S.Ct.* 1107, 1112, 94 *L.Ed.*2d 282, 290 (1987) (observing that "statutes regulating the economic relations of landlords and tenants are not *per se* takings"). In fact, the Court has been reluctant to determine whether a rent control ordinance violates the constitutional prohibition against the taking of private proper-

ty without just compensation based solely on theoretical arguments. *Pennell v. City of San Jose,* 485 *U.S.* 1, 9–10, 108 *S.Ct.* 849, 856–57, 99 *L.Ed.*2d 1, 13 (1988). It has found "it particularly important in takings cases to adhere to [the] admonition that 'the constitutionality of statutes ought not be decided except in an actual factual setting that makes a decision necessary.'" *Id.* at 10, 108 *S.Ct.* at 856, 99 *L.Ed.*2d at 13 (quoting *Hodel v. Va. Surface Mining & Reclamation Ass'n, Inc.,* 452 *U.S.* 264, 294–95, 101 *S.Ct.* 2352, 2370, 69 *L.Ed.*2d 1, 27–28 (1981)).

▮▮ Here, the landlords posit a theoretical argument with regard to the 2000 amendment by claiming that it deprived them of their right to rent the apartment at market rate. That argument does not challenge the ordinance as applied to them, because they were not the original purchasers of 81 Adams Street and by the time they acquired the property in 2006, the amendment was already in effect. Hence, it could not have diminished whatever reasonable investment-backed expectations they had at the time of purchase. For that reason, they are simply challenging the facial validity of the 2000 amendment. Such challenges are disfavored, as explained in *Pennell, supra,* 485 *U.S.* at 10, 108 *S.Ct.* at 856, 99 *L.Ed.*2d at 13.

▮▮ The power of a municipality to adopt rent control ordinances was recognized by our Court in *Inganamort v. Borough of Fort Lee,* 62 *N.J.* 521, 528–38, 303 *A.*2d 298 (1973). Subsequent courts cautioned, however, that landlords may not be forced to subsidize their tenants' housing needs, and rent control ordinances must not be confiscatory. *Brunetti v. Borough of New Milford,* 68 *N.J.* 576, 595, 350 *A.*2d 19 (1975); *Silverman, supra,* 277 *N.J.Super.* at 533, 649 *A.*2d 1342. To that end, rent control schemes must provide a mechanism to adjust maximum rents without greater delay than practically necessary. *Silverman, supra,* 277 *N.J.Super.* at 533, 649 *A.*2d 1342 (citing *Hutton Park Gardens v. West Orange Town Council,* 68 *N.J.* 543, 568, 350 *A.*2d 1 (1975)).

In *Silverman,* we considered whether a municipality's failure to appropriately and expeditiously adjudicate the landlords' applica-

tion for a hardship rent increase, which resulted in their loss of rental income, constituted a partial taking without just compensation. *Id.* at 528–33, 649 *A.*2d 1342. We concluded that it did not, holding "that in order to recover damages on an inverse condemnation claim, the municipal agency's decision and the administrative lag in according a remedy must have substantially destroyed the landlord's beneficial use of his property." *Id.* at 537, 649 *A.*2d 1342.

Here, the 2000 amendment which applied rent control to the Caparra homes imposed no bureaucratic obstacles or delays to an aggrieved property owner. Disputes as to appropriate base rents were handled in the same manner as with other properties subject to the ordinance. Moreover, application of the amendment did not destroy the landlords' beneficial use of their property. The landlords were able to collect $1855 per month for their rental unit and they could apply for annual adjustments and hardship increases to augment that figure. Thus, the 2000 amendment did not constitute a taking of their property without just compensation.

 The landlords' remaining taking arguments present as-applied challenges based on their claim that the 2005 legal base rent determination caused them to suffer discrete economic losses. Their contention that the 2005 determination constituted a taking without just compensation is not ripe for adjudication, however.

In *Williamson County Regional Planning Commission v. Hamilton Bank*, 473 *U.S.* 172, 186–87, 105 *S.Ct.* 3108, 3116, 87 *L.Ed.*2d 126, 138–39 (1985), the Court refused to consider the property owner's takings claim because the owner had not utilized all of the procedures that the government regulations provided for obtaining just compensation. The Court explained that "a claim that the application of government regulations effects a taking of a property interest is not ripe until the government entity charged with implementing the regulations has reached a final decision regarding the application of the regulations to the property at issue." *Id.* at 186, 105 *S.Ct.* at 3116, 87 *L.Ed.*2d at 139. That rule has been applied by New Jersey courts in a variety of contexts.

*See, e.g., Warren Cnty. Vocational–Technical Sch. Educ. Ass'n v. Warren Cnty. Vocational–Technical Sch. Bd. of Educ.,* 320 *N.J.Super.* 1, 8, 726 *A.*2d 939 (App.Div.) (holding that "no Federal right exists where the State has provided an adequate means of pursuing the claim"), *certif. denied,* 162 *N.J.* 487, 744 *A.*2d 1210 (1999); *Main Union Assocs. v. Twp. of Little Falls Rent Leveling Bd.,* 306 *N.J.Super.* 404, 421, 703 *A.*2d 971 (App.Div.1997) (rejecting inverse condemnation claim because other means existed for recouping lost property value), *certif. denied,* 153 *N.J.* 402, 709 *A.*2d 795 (1998).

The landlords have not utilized all of the procedures available for mitigating any economic loss caused by the 2005 base rent determination. First, they had the right to appeal from the 2005 determination, yet failed to timely exercise that right. Second, they had the right to apply for a hardship rent increase but did not make such an application until three years after purchasing the Adams Street property. They also retained the right to apply for updated legal base rent determinations and tax abatements. The landlords' failure to utilize all of the procedures available to them to obtain just compensation renders the issue unripe and leaves us unable to evaluate whether their reasonable investment-backed expectations have been violated. *Williamson Cnty., supra,* 473 *U.S.* at 191, 105 *S.Ct.* at 3118–19, 87 *L.Ed.*2d at 141.

In sum, the landlords' claim that the City's rent control ordinance violates the constitutional proscription against the taking of private property without just compensation lacks merit. Their argument that the 2000 amendment is facially invalid is contrary to well-established law that upholds the power of municipalities to enact rent control ordinances. Their argument that the 2005 base rent determination deprived them of rental income is unripe, because they failed to utilize all procedures available to them to maximize their rental income.

## VI.

The landlords argue that the attorney fee award was unreasonable because "[t]he sums were aggregated, failed to

segregate as to issues, and included grossed up figures for emails and the like." We discern no abuse of discretion in the award of counsel fees.[8]

Under the CFA, a prevailing plaintiff is entitled to recover reasonable attorney fees, filing fees and costs of suit. *N.J.S.A.* 56:8–19; *Furst v. Einstein Moomjy, Inc.,* 182 *N.J.* 1, 21, 860 *A.*2d 435 (2004). The purpose of awarding attorney fees for CFA violations is to provide an incentive for an attorney to take a case involving a minor loss. *Furst, supra,* 182 *N.J.* at 21, 860 *A.*2d 435.

In setting a fee award the court applies the standards enunciated in *Rendine v. Pantzer,* 141 *N.J.* 292, 322–23, 661 *A.*2d 1202 (1995). *Furst, supra,* 182 *N.J.* at 21, 860 *A.*2d 435. Pursuant to those standards, the award must be based on the " 'lodestar,' which equals the 'number of hours reasonably expended [by the attorney] multiplied by a reasonable hourly rate.' " *Ibid.* (quoting *Rendine, supra,* 141 *N.J.* at 335, 661 *A.*2d 1202).

There are four considerations in setting the lodestar. The first is the reasonableness of the attorney's fee, evaluated under the factors set forth in *RPC* 1.5(a).[9] *Furst, supra,* 182 *N.J.* at 21–

---

[8] Initially, the tenants cross-appealed from the fee award, arguing that the court erred by allowing only twelve of the thirty-four attorney hours billed for motions, certifications and exhibits, and allowing no hours at all for email communications exchanged between attorney and clients over a fourteen-month period. The tenants have since withdrawn their challenge to the attorney fee award "to facilitate the resolution of this appeal."

[9] *RPC* 1.5(a) lists the following factors to be considered in determining the reasonableness of an attorney's fees:

> (1) the time and labor required, the novelty and difficulty of the questions involved, and the skill requisite to perform the legal service properly;
> (2) the likelihood, if apparent to the client, that the acceptance of the particular employment will preclude other employment by the lawyer;
> (3) the fee customarily charged in the locality for similar legal services;
> (4) the amount involved and the results obtained;
> (5) the time limitations imposed by the client or by the circumstances;
> (6) the nature and length of the professional relationship with the client;

22, 860 A.2d 435. Second, the court considers the reasonableness of the time billed by the attorney, since a party is not entitled to counsel fees for excessive and unnecessary hours. *Id.* at 22, 860 A.2d 435. Third, the court determines whether the award should be decreased because the plaintiff "achieved limited success in relation to the relief he had sought." *Id.* at 23, 860 A.2d 435. Fourth, the court must decide whether the attorney is entitled to a fee enhancement if the attorney worked under a contingency agreement. *Ibid.*

Fee determinations by trial courts will be accorded substantial deference and disturbed only on the rarest of occasions and then only because of a clear abuse of discretion. *Packard–Bamberger & Co. v. Collier,* 167 *N.J.* 427, 444, 771 A.2d 1194 (2001); *Rendine, supra,* 141 *N.J.* at 317, 661 A.2d 1202; *Yueh v. Yueh,* 329 *N.J.Super.* 447, 466, 748 A.2d 150 (App.Div.2000). An abuse of discretion in the award of counsel fees may be demonstrated "if the discretionary act was not premised upon consideration of all relevant factors, was based upon consideration of irrelevant or inappropriate factors, or amounts to a clear error in judgment." *Masone v. Levine,* 382 *N.J.Super.* 181, 193, 887 A.2d 1191 (App. Div.2005).

Here, the court reviewed affidavits of services that set forth a total fee application of $48,793.50. The court found that counsel's hourly rate of $225 per hour was "more than reasonable in this vicinage" in light of counsel's specialized practice area and level of experience. The court also examined the billing entries "line by line" and determined that several of them were excessive. From the 192 hours billed, the court deducted 62.61 hours, resulting in a reasonable time billed of 129.39 hours. Multiplying by the reasonable hourly rate, the court arrived at a lodestar amount of

(7) the experience, reputation, and ability of the lawyer or lawyers performing the services;

(8) whether the fee is fixed or contingent.

$29,112.75. It applied no enhancements or diminishments to the lodestar. In addition, costs of $738.32 were imposed.

The landlords' vague assertions that the sums were aggregated, failed to segregate as to issues, and included grossed up figures for emails are simply not supported by the record. The affidavits of service are reasonably detailed, billed in quarter-hourly increments and not aggregated. The court specifically rejected the landlords' argument that the billing entries were too vague to separate out issues, finding that all issues in the case stemmed from the overcharged rent. There is adequate evidence in the record to support that conclusion. Finally, as to the hours attributed to emails, the court disallowed them in their entirety, and therefore cannot serve as a source of error.

The landlords' terse argument fails to establish an abuse of discretion by the trial court, *see Miller v. Reis*, 189 *N.J.Super.* 437, 445, 460 *A.*2d 210 (App.Div.1983) (noting that "an argument employing this economy of words and authority does little to persuade us of the righteousness of the claim"), and therefore we discern no reason to disturb the result.

## VII.

We have reviewed and considered the landlords' remaining claims and find them to be without sufficient merit to warrant discussion in this opinion. *R.* 2:11–3(e)(1)(E).

Affirmed.